LAW OFFICES OF JOSHUA B. KONS, LLC
Joshua B. Kons (SBN 244977)
92 Hopmeadow Street, Suite ~~LL1~~
205
Weatogue, CT 06089
Tel: (860) 920-5181
Fax: (860) 920-5174
joshuakons@konslaw.com

[Additional Counsel Listed on Signature Page]

Attorneys for Plaintiffs MARK FERRY, VALERIE HAMERLING, IGOR KOROSTELEV, and RYAN KRAUSE

**U.S. DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARK FERRY, VALERIE HAMERLING, IGOR KOROSTELEV and RYAN KRAUSE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>DF GROWTH REIT, LLC,<br>DF GROWTH REIT II, LLC,<br>DIVERSYFUND, INC.,<br>CRAIG CECILIO, and ALAN LEWIS,<br><br>Defendants. | CASE NO. 22 CV-2001-AJB-WVG<br><br>~~**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**~~<br><br>~~**1) VIOLATION OF CAL. CORP. CODE § 25401**~~<br><br>~~**2) VIOLATION OF CAL. CORP. CODE § 25504**~~<br><br>~~**JURY TRIAL DEMANDED**~~<br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**1) VIOLATION OF CAL. CORP. CODE § 25401**<br><br>**2) VIOLATION OF CAL. CORP.** |

**CODE § 25504**

**JURY TRIAL DEMANDED**

Plaintiffs Mark Ferry, Valerie Hamerling, Igor Korostelev and Ryan Krause ("Plaintiffs"), by and through their undersigned counsel, hereby allege upon information and belief[1] except as to their own transactions, as and for their ~~First~~Second Amended Class Action Complaint[2] against the above-captioned Defendants (as further defined below) as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter presented by this Class Action Complaint because it is a class action arising under the Class Action Fairness Act of 2005, Pub. L. No. 102-2, 119 Stat. 4 (2005) ("CAFA"), which explicitly provides for the original jurisdiction of the federal courts of any class action in which any member of the plaintiff class is a citizen of a state different

---

1. Plaintiffs' allegations on information and belief are based upon publicly available information including, *inter alia*, filings with the U.S. Securities and Exchange Commission ("SEC"), court and administrative filings including those in SEC Administrative Proceeding File No. 3-20801 and related litigation, filings with the California Bureau of Real Estate, and websites and Internet advertisements prepared and/or disseminated by Defendants.

2. The putative Class is defined as all persons who purchased DiversyFund Investor Shares (Class A Investor Shares in REIT I and REIT II, as defined below) between November 13, 2018 and March 16, 2022 (the "Class Period").

from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

2. Plaintiffs allege that the total claims of the individual members of the Class in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5).

3. Plaintiffs are citizens of Kansas, California, Illinois and Arizona, and as set forth below, Defendants can be considered citizens of California by virtue of the locations of their residences and/or principal offices. Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A) because "any member of a class of plaintiffs is a citizen of a State different from any defendant."

4. Furthermore, Plaintiffs allege that more than two-thirds of all of the members of the proposed Class in the aggregate are citizens of a state other than California, in which this action is originally being filed, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

5. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 because, as set forth below, Defendants conduct business in, and may be found in, this District.

**THE PARTIES AND SIGNIFICANT NONPARTY**

6(a). Plaintiff Mark Ferry, a citizen and resident of Kansas, invested $25,000 in DiversyFund Investor Shares (as defined below) in or about 2020. Class A Investor Shares of DF Growth REIT, LLC ("REIT I") on or about June 22, 2020. Plaintiff Ferry continues to hold his shares in REIT I. Mr. Ferry made subsequent investments in Class A Investor Shares of REIT I, in the sum of approximately $600, between July 2020 and January 2021, pursuant to REIT I's Dividend Reinvestment Plan.

(b). Plaintiff Valerie Hamerling, a citizen and resident of California, invested over $500 in DiversyFund Investor Shares between 2021 and present. Specifically, Plaintiff Hamerling invested $1,000 in Class A Investor Shares of REIT I on or about June 2, 2021, and another $1,000 on or about August 10, 2021. Plaintiff Hamerling invested $500 into DF Growth REIT II, LLC ("REIT II") on or about November 17, 2021, another $500 on or about December 22, 2021, and another $500 on or about January 4, 2022. Plaintiff Hamerling continues to hold her shares in REIT I and REIT II.

Formatted: Highlight

(c). Plaintiff Igor Korostelev, a citizen and resident of Illinois, invested over $500 in DiversyFund Investor Shares between 2018 and the present.

(d). Plaintiff Ryan Krause, a citizen and resident of Arizona, invested $500 in DiversyFund Investor Shares between 2018 and the present.

7. Defendant DF Growth REIT, LLC ~~(“~~(defined above as “REIT I”) is a Delaware limited liability company formed in 2018. REIT I’s principal executive offices are located at 750 B Street Suite 1930, San Diego, California. REIT I was formed as a “blind pool” company and filed an offering statement in connection with an offering pursuant to SEC Regulation A to raise up to $50 million through the sale of its Class A Investor Shares (“REIT I Offering”). REIT I was subsequently authorized to raise up to a total of $75 million by selling Class A Investor Shares and raised a total of $65,342,869 through the sale of stock to approximately 25,828 public investors before ceasing its offering on November 13, 2021. REIT I has invested proceeds of the REIT I Offering in equity in thirteen real estate projects, including eleven managed by its Sponsor, DiversyFund (as defined below). Upon information and belief, REIT I has no employees and is completely reliant on DiversyFund for its day-to-day operations.

8. Defendant DF Growth REIT II, LLC ~~(“~~(defined above as “REIT II”) is a Delaware limited liability company formed in 2020. REIT II’s principal executive offices are located at 750 B Street Suite 1930, San Diego, California. REIT II was formed in 2020 as a “blind pool” company and filed an offering

statement in connection with an offering pursuant to SEC Regulation A to raise up to $50 million through the sale of its Class A Investor Shares ("REIT II Offering"). As of April 29, 2022, REIT II had raised approximately $10,737,607 through the sale of stock to approximately 3,712 public investors. REIT II has invested proceeds of the REIT II Offering in equity in five real estate projects, including three managed by its Sponsor, DiversyFund, Inc. (as defined below). Upon information and belief, REIT II has no employees and is completely reliant on DiversyFund for its day-to-day operations.

9. Significant non-party DF Manager, LLC ("DF Manager") is a Delaware limited liability company formed in 2018. DF Manager's principal executive offices are located at 750 B Street Suite 1930, San Diego, California. DF Manager serves as manager of both REIT I and REIT II pursuant to certain management agreements dated August 1, 2018 and August 20, 2020, respectively. Upon information and belief, DF Manager has no employees and is completely reliant on DiversyFund for its day-to-day operations.

10. Defendant DiversyFund, Inc. ("DiversyFund" or the "Sponsor") is a Delaware corporation formed in 2016. DiversyFund's principal executive offices are located at 750 B Street Suite 1930, San Diego, California. DiversyFund serves as the sponsor of REIT I and REIT II, and owns 100% of DF Manager.

11. Defendant Craig Cecilio, formerly known as Charles Craig Cecilio ("Cecilio"), is and was at all relevant times the co-founder and Chief Executive Officer of DF Manager and DiversyFund. Cecilio co-owns DF Manager along with Defendant Alan Lewis and, along with Lewis, has complete *de facto* control of REIT I and REIT II. At all relevant times Cecilio provided material aid to DiversyFund, DF Manager, REIT I, and REIT II by rendering day-to-day operational and management services to those entities. Cecilio is a citizen and resident of California.

12. Defendant Alan Lewis ("Lewis") is and was at all relevant times the co-founder and Chief Investment Officer of REIT I, REIT II, DF Manager and DiversyFund. Lewis co-owns DF Manager along with Cecilio and, along with Lewis, has complete *de facto* control of REIT I and REIT II. At all relevant times Lewis provided material aid to DiversyFund, DF Manager, REIT I, and REIT II by rendering day-to-day operational and management services to those entities. Lewis is a citizen and resident of California. Defendants REIT I, REIT II, DiversyFund, Cecilio and Lewis are hereinafter sometimes collectively referred to below as "Defendants".

## FACTUAL BACKGROUND

### A. Business of DiversyFund

13. A certain exemption from registration known as "Regulation A" (set forth in 17 C.F.R. §230.251 *et seq.*) allows companies to offer and sell securities to the public without having to register the offerings with the SEC so long as the issuer fully complies with the regulation's requirements. Regulation A, which went into effect in 2015, has permitted certain issuers to sell unregistered securities to larger numbers of small retail investors than would have been possible under exemptions from registration that existed prior to its promulgation.

14. Against this backdrop, DiversyFund has sponsored and offered to the public a series of securities that are exempt from registration – some under Regulation A, and others under the exemption from registration set forth in 17 C.F.R. §230.506 and commonly referred to as "Regulation D".

15. Prior to 2016, Defendants Cecilio and Lewis used DiversyFund as a loose assumed name for their respective real estate business ventures. However, in 2016 Defendants Cecilio and Lewis formalized this loose assumed name by incorporating DiversyFund, Inc., with the stated purpose of bringing the wealth-building investment tools traditionally used by the wealthy ("the 1%") to the everyday investor through participation in alternative investments, such as REITs. DiversyFund actively markets and sells its securities offerings directly to individual retail investors though, for example, posts on social media platforms

such as Twitter and Facebook, content on its own website, and what appear to be "sponsored content" articles on various finance-oriented websites such as Morning Brew, Business Insider and Nerdwallet. DiversyFund's target investors are generally unsophisticated, non-accredited individual retail investors. Upon information and belief, DiversyFund pays handsomely for advertising on these online websites, newsletters, and social media platforms, with a general marketing budget to spend of as much as $200,000 a month at relevant times.

16. DiversyFund represents to the public that its real estate investments are categorized as "growth" investments, as opposed to "income" investments. Its business model is purportedly based on a five-stage growth cycle that includes: (1) raising capital, (2) acquiring assets, (3) performing value-add renovations to the properties which allows for increased rents and greater appreciation, (4) time for natural market appreciation, and (5) sale of the property based on market conditions.

17. In addition to REIT I and REIT II offerings qualified under Regulation A, DiversyFund has sponsored or managed approximately eight issuers raising capital under the exemption from registration set forth in 17 C.F.R. §230.506 (commonly referred to as "Regulation D").

18. Consistent with DiversyFund's business model and marketing strategy, REITs I and II currently have thousands of individual retail shareholders who bought shares offered pursuant to the Regulation A exemption, which were sold directly to investors by Defendants in increments of as little as $500. The stated purpose of REIT I and REIT II is to invest in real estate projects and assets across the United States, focusing primarily on multifamily value-add properties.

19. Also consistent with DiversyFund's business model, both REIT I and REIT II have solicited large numbers of very small public investors via the Internet and social media advertising. REITs I and II reportedly have a total of 29,550 investors between them, which based on the total of approximately $73 million raised, suggests that the average investor in REITs I and II has invested less than $3,000.

20. By virtue of their management services, Defendants Cecilio and Lewis each personally directly and indirectly controlled DiversyFund, DF Manager, REIT I and REIT II in that they were the principal natural persons that were responsible for the day-to-day operations of REIT I and REIT II, which included but was not limited to the offer and sale of the DiversyFund Investor Shares to the Plaintiffs and the Class. Defendants Cecilio and Lewis were each displayed prominently on the marketing materials (including the DiversyFund

website) containing certain misrepresentations and omissions at issue, thereby rendering material aid in connection with the offer and sale of the DiversyFund Investor Shares to the Plaintiffs and the Class. Finally, by virtue of their execution of the Regulation A offering circulars (and amendments thereto) under which the DiversyFund Investor Shares were offered and sold to the Plaintiffs and the Class, along with other SEC filings containing some of the untrue statements of material fact or bearing omissions of material fact, Defendants Cecilio and Lewis each materially participated in the offer and sale of DiversyFund Investor Shares via their participation in dissemination of communications containing untrue statements of material fact and/or omitting material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, their day-to-day involvement in management of DiversyFund and collection of fees from REIT I and REIT II, and otherwise.

**B. REIT I**

~~20~~21. REIT I, formed in 2018, filed an offering statement on October 3, 2018 under Regulation A to raise up to $50 million through the REIT I Offering. All of the sales in the REIT I Offering to Plaintiffs and the Class were made pursuant to the Form 1-A/A filed with the SEC and dated October 22, 2018, and subsequent supplements thereto. REIT I also filed semi-annual and annual reports

with the SEC that contained additional disclosures from REIT I about REIT I and the Defendants.

~~21~~22. REIT I was subsequently authorized to raise up to a total of $75 million by selling Class A Investor Shares and, as of June 30, 2022, had raised a total of $65,342,869 through the sale of stock to approximately 25,828 public investors. REIT I has invested proceeds of the REIT I Offering in equity in thirteen real estate projects, including eleven managed by its Sponsor, DiversyFund.

~~22~~23. As the Sponsor of REIT I, DiversyFund is entitled to receive a panoply of fees in connection with REIT I's acquisition of properties, including an acquisition fee (of up to 8% of project cost) for sponsoring the acquisition of each asset. DiversyFund is also entitled to receive a financing fee at the asset level of up to 1% of the total debt amount obtained for a project. In addition to these transaction-based fees, through its wholly owned subsidiary DF Manager, DiversyFund was entitled to receive an asset management fee equal to 0.1667% of the investors' aggregate capital accounts per month, or approximately 2% per year- although it appears that DF Manager has not collected these asset management fees to date. Upon information and belief, DiversyFund relied on revenue derived from some

combination of the foregoing fees to cover its day-to-day operating expenses, including payroll for its 19+ employees and contractors.

~~23~~24. REIT I has been authorized to raise up to $75,000,000 of capital by selling Class A Investor Shares. As of November 12, 2021, REIT I completed raising new capital. As of June 30, 2022, the REIT I Offering had raised $65,342,869 in total proceeds.

**C. REIT II**

~~24~~25. REIT II was formed in August 2020 and filed an offering statement under Regulation A to raise up to $50 million through the sale of its Class A Investor Shares via the REIT II Offering.

~~25.~~ As with REIT I, DiversyFund is entitled to receive a panoply of transaction-based fees in connection with REIT II's acquisition of properties, including an acquisition fee of 1-4%. As with REIT I, through its wholly owned subsidiary DF Manager, DiversyFund is also entitled to charge an annual asset management fee equal to 2% of the capital raised from the sale of Class A investor shares.

26. Unlike REIT I, on information and belief REIT II actually has been charged asset management fees by DiversyFund (per DF Manager) to date, and has

disclosed that it may potentially be required to pay up to five years' annual asset management fees in advance, at DiversyFund's sole discretion. DF Manager serves as manager of REIT II pursuant to a management agreement dated August 20, 2020 under which DF Manager is entitled to collect a management fee described as follows:

> **Management Fee**. Each month, the Manager shall be entitled to an asset management fee equal to one-sixth of one percent (0.167%) of the aggregate capital accounts of the Members on the last day of such month. Such fee shall be paid by the fifteenth (15th) day of the following month.

Based on DiversyFund's 100% ownership of DF Manager, these asset management fees would flow back to DiversyFund.

27. As of December 13, 2021, REIT II had raised approximately $8,032,282 through the sale of stock to approximately 3,712 public investors. REIT II ultimately raised a total of approximately $11.3 million before its public offering was effectively terminated in early 2022.

28. In March 2022, the SEC alleged that REIT II had violated various regulations (see *infra*). DiversyFund subsequently terminated REIT II's offering in June 2022.

29. REIT II has invested proceeds of the REIT II Offering in equity in five real estate projects, including three managed by DiversyFund. REIT II is a co-

investor with REIT I in multiple projects including a joint investment by both REITs in two Texas multifamily properties

**D. <u>The SEC Cases</u>**

30. DiversyFund appears to have had a long history of entanglement with the SEC. On January 14, 2020, the Los Angeles Office of the SEC (Investigation No. LA-5069) communicated that it had closed an investigation into DiversyFund, Inc. The pendency of this investigation was not contemporaneously disclosed by DiversyFund either to existing investors or new investors in REIT I. Given the integral role DiversyFund played in the success or failure of REIT I as its sponsor and parent company (on which REIT I completely relied on to operate), the pendency or closure of an SEC investigation into DiversyFund was a crucial fact that any individual retail investor would have found to be material.

31. In late 2021 the SEC launched a second investigation (Investigation No. LA-5266) into DiversyFund and its affiliates. This second investigation eventually resulted in the SEC's temporary suspension of REIT II's Regulation A exemption from registration in an Order (Ad. Proc. File No. 3-20801) dated March 16, 2022, based upon the SEC's stated belief that REIT II's offering did not comply with certain terms, conditions or requirements of Regulation A.

32. The SEC further alleged that it had reason to believe that "REIT II's offering documents and the website it uses to solicit investors contain untrue statements of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading." *See* 17 C.F.R. § 230.258(a)(2).

33. Specifically, the SEC alleged that REIT II's January 2021 offering circular ("REIT II Offering Circular"), and REIT II's August 26, 2021 offering circular supplement ("REIT II Offering Circular Supplement") made materially misleading representations regarding REIT II being a separate investment vehicle from REIT I, regarding how much capital REIT II needed to raise from investors, regarding its plan of operation based on the amount of capital raised, and regarding its fees.

34. In connection with this second investigation, on November 29, 2021, the SEC's staff informed REIT II that it could no longer sell securities in the REIT II Offering because of 17 C.F.R. §230.262(a)(7), which provides that issuers "under investigation" are disqualified.

35. REIT II then submitted a request for a waiver of disqualification, as permitted by 17 C.F.R. §230.262(b). The waiver request asserted that disqualification was inappropriate because the SEC had not alleged any specific

wrongdoing, and because REIT II and its investors would be harmed by the disqualification. The SEC denied REIT II's request for waiver.

36. On December 6, 2021, REIT II filed a notice of intent to file a petition pursuant to Rule 430(b)(1) of the SEC's Rules of Practice. On December 13, 2021, the Company filed the petition, which had the effect of pausing REIT II's automatic disqualification.

37. On January 26, 2022, the SEC provided the REIT II with two orders that had the effect of reinstating disqualification of the REIT II Offering under 17 C.F.R. §230.262(a)(7). As a result, REIT II promptly ceased offers or sales of Class A Investor Shares.

38. On March 16, 2022, the SEC issued a ~~temporary suspension order~~Temporary Suspension Order (annexed as **Exh. 1**) under Rule 258 based on alleged violations of SEC rules including, *inter alia*, REIT II's failure to commence the REIT II Offering within the time required by Regulation A and REIT II's alleged misrepresentations of fact made on DiversyFund's website. The SEC alleged that because of these violations of SEC rules, REIT II's reliance on Regulation A for an exemption from registration for its Class A Investor Shares was invalid.

39. The SEC case remains pending and is set for hearing starting on April 17, 2023. 39. On June 9, 2023, the SEC entered an Order Making Findings and Permanently Suspending Exemption Pursuant to Section 3(B) of the Securities Act of 1933 and Rule 258 of Regulation A Thereunder (Ad. Proc. File No. 3-20801) ("Final SEC Order") that resolved its charges concerning REIT II. This document is annexed hereto as **Exh. 2**. In the Final SEC Order, the SEC found (*inter alia*) that REIT II failed to comply with "terms, conditions or requirements" of Regulation A and ordered that "REIT II's exemption from registration under Regulation A be, and hereby is, permanently suspended." As a result of the Temporary Suspension Order and the Final SEC Order, REIT II has not sold Class A Investor Shares to the public since early 2022 and REIT II's public offering is effectively terminated, having raised proceeds totaling only $11.3 million.

Formatted: Normal, Indent: First line: 0.5", Line spacing: single

Formatted: Font: +Body (Times New Roman)

**E. Defendant Cecilio's Regulatory Sanctions by the California Bureau of Real Estate**

40. Just before DiversyFund launched REIT I, Defendant Cecilio and a company that he controlled (and that also was apparently marketed under the DiversyFund name) faced administrative accusations by the California Real Estate Bureau.

41. On or about February 15, 2017, the California Bureau of Real Estate brought an administrative accusation against Cecilio and a company 100% owned

and controlled by him, Coastal California Funding Group, Inc. ("Coastal"), alleging that Coastal had incurred shortages in trust accounts entrusted to it in connection with Coastal's loan servicing business, and that Cecilio failed to properly supervise Coastal and its staff. *See In Coastal California Funding Group Inc.*, Accusation No. H-04876 SD.

42. Audits by the Bureau of Real Estate also found that Coastal had recorded sums in its books and records as deposited that had not in fact been deposited, in the sum of $1,224,406.26. This inability to properly manage the trust account resulted in a shortfall of $94,813.20, which Defendant Cecilio appears to have covered personally.

43. Finally, the Bureau of Real Estate found the Coastal had in fact conducted business as "DiversyFund" as a false or fictitious business name on business cards and in e-mails without obtaining a license from the Bureau.

44. Based on the foregoing, the Bureau charged that Cecilio had failed to adequately supervise the activities of Coastal to ensure compliance with applicable laws and regulations, and that his conduct constituted "cause for suspension or revocation of [his and Coastal's] real estate licenses… for willful disregard of the Real Estate Law."

45. Ultimately, Defendant Cecilio consented to having his real estate license suspended on October 2, 2017, which suspension was stayed for a period of two years on terms and conditions. Cecilio agreed to monetary penalties and the temporary suspension of his real estate license in a stipulation signed on July 28, 2017.

**F. Defendants' Collection of Exorbitant Developer/Acquisition Fees**

46. REIT I and REIT II made incomplete partial disclosures concerning the right of DiversyFund to collect acquisition and developer fees when the REITs acquired interests in property, which did not fully explain how the acquisition and developer fees would be calculated in each instance. DiversyFund then collected exorbitant acquisition fees that appear to have exceeded what Defendants had represented DiversyFund would collect from REIT I and REIT II, while at best partially disclosing the quantum of developer and acquisition fees paid, and the method of calculating same.

47. In its offering circular dated October 19. 2018 ("REIT I Offering Circular"), REIT I represented as follows:

REPORT TO INVESTORS

No less than once per year, the Company will provide Investors with a detailed statement showing:

- The fees paid to the Manager and its affiliates; and
- Any transactions between the Company and the Manager or its affiliates.

In each case, the detailed statement will describe the services performed and the amount of compensation paid.

48. In the REIT II Offering Circular, REIT II represented as follows:

REPORT TO INVESTORS

No less than once per year, the Company will provide Investors with a detailed statement showing:

- The fees paid to the Sponsor and its affiliates; and
- Any transactions between the Company and the Sponsor or its affiliates.

In each case, the detailed statement will describe the services performed and the amount of compensation paid.

49. On information and belief, no "reports to investors" consistent with the representations in ¶¶ 47 and 48 have been provided to investors. Instead, REIT I and REIT II have described acquisition and developer fees in a piecemeal fashion in their periodic filings with the SEC. Read in the aggregate, these piecemeal disclosures raise the inference that acquisition and developer fees collected to date substantially exceed the maximum fees that Defendants represented would be paid to DiversyFund- no more than 8% of REIT I's share of any project's total cost, and no more than 4% of REIT II's share of any project's cost.

50. REIT I at its outset represented as follows concerning in the REIT I Offering Circular (REIT I is referred to as the "Company").

> Where the Company owns property directly, or is the sole owner of an entity that owns property, the Sponsor will charge the Company a developer fee of between 6% and 8% of the total project costs, including both "hard" costs (e.g., the cost of land, buildings, construction, and renovation) and "soft" costs (e.g., professional fees).
>
> Where property is owned by an entity in which there is another financial partner – a joint venture – the Sponsor might be entitled to a similar developer fee to the extent negotiated with the financial partners in such joint venture, which could be higher than the 6% - 8% fee for direct investment. However, the Company's cost of the fee will not exceed 6% - 8% of the Company's share of the total project cost.
>
> Estimate: The amount of the developer fee will depend on the cost of projects and, in the case of joint ventures, the terms our Sponsor negotiates with joint venture partners. We cannot make a reasonable estimate today.

51. The foregoing description was repeated verbatim in various subsequent SEC filings by REIT I.

52. However, in or about May 2019 REIT I invested $250,000 in a project known as DiversyFund Park Blvd, LLC. In connection with DiversyFund Park Blvd, LLC, DiversyFund appears to have collected a development fee of approximately $1,250,000 from REIT I. *See* REIT I Offering Circular Supplement No. 3 on Form 253G2, filed with the SEC on May 21, 2019. REIT invested additional sums in DiversyFund Park Blvd, LLC at later dates, was listed as an owner of 52.62% of the equity in DiversyFund Park Blvd, and eventually made a

total investment of over $5 million in the project. *See* REIT I Annual Report on Form 1-K for the year ended December 31, 2020, filed with the SEC on April 30, 2021. However, no plausible scenario would result in REIT I being responsible for a $1,250,000 development fee based on an initial $250,000 investment, or even the eventual investment of over $5 million, given that the development fee should "not exceed 6% - 8% of the Company's share of the total project cost" as represented. At no subsequent time has REIT I disclosed as such that the development fees collected in connection with the DiversyFund Park Boulevard project exceeded 6% - 8% of the Company's share of the total project cost, nor has REIT I provided a detailed statement showing the fees paid to the Manager and its affiliates the services performed and the amount of compensation paid.

Formatted: Font: Times New Roman

53. In a subsequent disclosure concerning REIT I's investment of $3,451,705 in a project known as 4500 South State Street, LLC, REIT I stated that "an affiliate of the Company's Manager (the ~~"Sponsor")~~'Sponsor') will be entitled to receive from the Project Entity: A developer fee of 6-8% of total project costs. Currently, Sponsor estimates that the developer fee will be approximately". The author apparently forgot to fill in a blank before filing the form. Thus, REIT I's SEC filing failed to disclose the estimated quantum of fees chargeable to REIT I in connection with an investment of nearly $3.5 million of the REIT's funds. *See*

REIT I Offering Circular Supplement No. 7 on Form 253G2, filed with the SEC on November 18, 2020.

54. Beginning in- 2021, REIT I began to disclose even less information concerning fees payable to DiversyFund in connection with substantial investments by REIT I. In a series of SEC filings describing REIT I's investments in projects, the fees payable to DiversyFund are discussed only as follows: "An affiliate of the Company's Manager (the 'Sponsor') will be entitled to receive from the Project Entity: As described in 'Compensation of Management' in DF Growth REIT, LLC offering circular on pages 22-26."

55. Thus, neither the quantum of fees paid, nor the method of calculating same, was disclosed in connection with very substantial investments by REIT I. This vague language was used by REIT I to describe fees for the following projects.

| Date | Project | Sums Invested |
|---|---|---|
| February 18, 2021 | 201 SW Jefferson Way, LLC | $7,325,729.61 |
| December3, 2021 | Mission Villas SA, LLC | $4,576,987.75 |
| December 3, 2021 | WRTH North Charleston, LLC | $7,893,265.75 |
| January 14, 2022 | NCP Dove, LLC | $5,014,216.07 |

56. Thus, REIT I invested additional sums totaling over $24 million without disclosing how much in developer/acquisition fees it was paying in connection with each project, or the method for calculating the quantum of fees payable to DiversyFund for each project (other than by referring to the REIT I Offering Circular section on fees). *See* REIT I Offering Circular Supplements Nos. 9, 15 and 16 on Form 253G2, filed with the SEC on February 18, 2021, December 3, 2021 and January 14, 2022, respectively.

57. REIT II raised a lesser sum of ~~$10,737,607~~$11.3 million from sales of investor shares to the public before its offering was suspended as a result of the SEC investigation. However, REIT II exhibits a similar pattern of opacity with respect to its disclosures.

~~///~~

Formatted: Indent: First line: 0.5"

58. REIT II represented as follows concerning acquisition and developer fees:

> *Acquisition Fee*
>
> The Sponsor will charge each Project Entity (or the Company itself, if the Company owns real estate directly) an acquisition fee of between 1% and 4% of the total project costs, including both "hard" costs (e.g., the cost of property) and "soft" costs (e.g., professional fees).
>
> Where property is owned by an entity in which there is another financial partner – a joint venture – the Sponsor might be entitled to a similar acquisition fee to the extent negotiated with the financial partners in such

joint venture (which could be higher than the 1-4% acquisition fee for direct investment). However, the Company's share of the fee will not exceed 1-4% of the Company's share of the total sale price.

Estimate: If the Company raises the full $75,00,000 and maintains an average leverage ratio (borrowing) of 55%, the sponsor fee would range between $1,666,667 and $6,666,667.

(REIT II Offering Circular Supplement No. 1 on Form 253G2, filed with the SEC on August 26, 2021)

59. In connection with an investment of- $5,014,216.06 in a project known as NCP Dove, LLC, REIT II disclosed only as follows: "An affiliate of the Company's Manager (the "Sponsor") will be entitled to receive from the Project Entity the fees described in "Compensation of Management" in DF Growth REIT II, LLC offering circular on pages 32-34 and Supplement No 1."

60. In terms of acquisition fees, this incorporated language should mean that the acquisition fee charged by DiversyFund would not exceed 4% of the total project costs, if REIT II was the sole investor, or 4% of "the Company's share of the total sale price" of (as it appears) NCP Dove, LLC was a joint venture.

61. Yet it appears from REIT II's subsequent SEC filings that DiversyFund collected well in excess of 4% of REIT II's share of the acquisition price of NCP Dove, LLC. REIT II later disclosed in its annual report dated May 3, 2022 that "[f]or the period ending December 31, 2021, the Company has paid $1,280,2126 [sic] in acquisition fees to the Sponsor." Yet, REIT II appears only to

have made one investment as of that date- the investment of $5,014,216.06 in NCP Dove. This acquisition fee, equal to over 25% of REIT II's principal invested in NCP Dove, LLC at the time, cannot have equaled less than 4% of REIT II's share of the project expenses.

62. Further, a later SEC filing by REIT II indicates that NCP Dove, LLC's real estate purchase price was $46,370,000 and that REIT II's ownership is 31.72%. Therefore, the acquisition fees of $1,280,2126 must have far exceeded 4% of REIT II's share of the purchase price. *See* REIT II Form S-A dated September 28, 2022. Given that Defendants have made ongoing representations as to providing a "detailed statement" of fees, Plaintiffs and the Class would not have been alerted to potential misrepresentation regarding the management fees charged by DiversyFund at least until the "no management fee" representations were removed from the DiversyFund website and attendant investor update materials after November 30, 2021.

///

Formatted: Normal, Indent: First line: 0.5", Line spacing: single

Formatted: Font: +Body (Times New Roman), 10 pt

### G. Misrepresentations and Omissions of Material Fact by Defendants

#### 1. Separation of REIT I and REIT II

63. REIT I and REIT II were advertised as being completely separate investment funds. In November 2021, when both REIT I and REIT II were selling securities to the public, DiversyFund's website, www.DiversyFund.com, advertised to investors that REIT I and REIT II "operate as separate investment vehicles" and that "REIT I will not be impacted by REIT II in any way." Plaintiff Hamerling invested in REIT II in November 2021, December 2021, and January 2022. She generally relied on the representations about REIT II that were made on the DiversyFund.com website in connection with making her investments in REIT II.

64. In REIT II's offering materials, it also represented to investors that there was no minimum amount that it needed to raise in its Regulation A offering. For example, in the REIT II Offering Circular (dated January 19, 2021), REIT II represented that its Regulation A offering "has no minimum amount," and as such, "we will begin to deploy (spend) the money we raise right away, no matter how much or how little we raise." (REIT II Offering Circular, p. 1) REIT II also represented that "[w]hether we raise $50 million in offering or something less, proceeds of the Offering will satisfy our cash requirements. If we raise less than $50 million, we will simply make fewer investments." (REIT II Offering Circular, pp. 8, 73)).

65. After the SEC commenced its proceeding discussed above, REIT II then submitted a declaration sworn to by Defendant Lewis to the U.S. Court of Appeals for the Ninth Circuit in connection with a petition to stay the SEC's orders (Case No. 22-70023, filed on February 22, 2022) in which Lewis stated under oath that the loss of REIT II's ability to raise funds pursuant to Regulation A "will cause significant and irreparable harm to DiversyFund and their 30,000 investors" including investors in both REIT I and REIT II. In the declaration, Lewis also indicated that if REIT II did not co-invest in certain real estate deals alongside REIT I, "the deals will fall through and investors in REIT I will suffer a loss of nearly $1 million of deposits that have already been put toward the deals."

66. In a later supplemental declaration, Lewis painted an even more dire picture, stating that if the SEC case dragged on and prevented DiversyFund from raising additional capital under Regulation A, "all of the Petitioning Entities would be driven out of business" and stating that "[c]ontinued exempt offerings are the **only viable means** of continuing to meet [REIT I] and REIT II's capital needs… ." (Emphasis supplied).

67. The SEC charges that statements in court filings by REIT II, in which REIT II argued that the SEC's actions leading to a cessation of fundraising under Regulation A would cause losses to thousands of investors in REIT I and REIT II,

show that REIT II's representations that its offering had "no minimum amount" were false and misleading. The SEC further charges that REIT II's previous representations to investors in the REIT II Offering Circular that the REIT II offering had "no minimum amount" and that "[w]hether we raise $50 million in offering or something less, proceeds of the Offering will satisfy our cash requirements" were false and misleading.

68. Although it made generalized boilerplate disclosures about the potential adverse results of failing to raise sufficient capital, REIT II did not disclosemake a specific disclosure in its offering materials – in its risk factors or otherwise – that it needed to raise more than $10 million to be viable, or the known harm that would befall REIT II and its investors (closure of the business and losses to all investors) if it were unable to continue to raise additional funds in reliance on its Regulation A exemption. Indeed, REIT II said the opposite: "[w]hether we raise $50,000,000 in the Offering or something less, we believe the proceeds of the Offering will satisfy our cash requirements. If we raise less than $50,000,000, we will simply make fewer investments." (REIT II Offering Circular, p. 58)

69. Based on the foregoing, REIT II's representations to its investors – including Plaintiff Hamerling – regarding the separateness of REITs I and II were false and misleading, and also show that REIT II did in fact have minimum capital

needs, and needed to raise far more than the approximately $10total of $11.3 million it hadin fact raised by early(before the SEC suspended REIT II's offering on March 16, 2022) in order to be viable.

70. REIT I similarly failed to disclose the known harm that would befall REIT I and its investors if REIT II were unable to continue to raise sufficient funds in continuing reliance on its Regulation A exemption, due to the two REITs' interconnected investments and common management by DiversyFund and DF Manager. The Plaintiffs and the Class (including Plaintiff Hamerling) would have been unable to discover the true lack of separateness and untruth of the "no minimum" representation until, at the earliest, after February 15, 2022 when this information was disclosed in the Ninth Circuit action.

71. In addition, REIT I failed to disclose to REIT I investors that— contrary to its representation "REIT I will not be impacted by REIT II in any way"-- in order to remain operational as REIT I's sponsor, DiversyFund needed to obtain an ongoing source of funding or new investor capital such as that raised from REIT II investors. In fact, in 2021, REIT I had to loan DiversyFund $2,500,000 just to pay DiversyFund's operational expenses. One loan was made on June 22, 2021 for $2,000,000, and another loan of $500,000 on August 25, 2021. Not surprisingly, there is no corresponding disclosure in REIT I's offering circular

that contemplates loans from REIT I to DiversyFund to cover day-to-day operating expenses for the sponsor.

72. Furthermore, investors who invested in REIT I after the REIT II Offering commenced also would have been misled by Defendants' misstatements as to the interdependence of the two REITs. The Q&A statement on DiversyFund's website as of November 2021 was also false and misleading. The website question and answer read as follows: "Will launching REIT II impact my original REIT investment in any way? No, REIT I will not be impacted by REIT II in any way. The assets in REIT I will continue to be owned and operated by REIT I." A copy of this website page is annexed hereto as **Exh. 3**. The interdependence of the two REITs, and also REIT I's dependence on REIT II's continued fundraising under Regulation A, rendered DiversyFund's foregoing statement on its website false and misleading. For example, in May 2022, REIT I disclosed that in 2021 it had paid $32,456 to Lex Nova for legal services to REIT II.

73. REIT II's and Lewis's statements in REIT II's court filings quoted above demonstrate that both REIT I *and* REIT II's continued viability was contingent on REIT II's continued ability to raise new investor capital under the Regulation A exemption. At later dates, contrary to the "no minimum amount" representations, REIT II did in fact languish without access to additional investor

capital – thereby causing the REIT II investors significant actual injury to the funds that were invested. REIT II incurred net losses of $1,829,170 in 2022, the last year for which its audited financial reports are presently available.

**2. Fees**

**(a) Management Fees**

74. Both REIT I and REIT II heavily advertised as a selling point on DiversyFund's website and elsewhere having "no management fees". In the case of REIT II, this representation was flatly untrue, as REIT II did in fact charge management fees. In the case of REIT I, it was a best a half truth, as DF Manager was entitled to collect a 2% per annum management fee for investments made on or after January 1, 2020. REIT I had previously *waived* management fees to which DF Manager would otherwise have been entitled, for investments made on or before December 31, 2019 *only*.

75. Although part of REIT I's original business plan contemplated that it would be charged 2% a year asset management fees by DF Manager, within months of becoming qualified, in February 2019 REIT I announced that it was temporarily offering a lifetime waiver of asset management fees for new REIT I investors for investments made prior to March 31, 2019. Shortly thereafter, in

May 2019, REIT I also announced that it was dropping its minimum investment from $2,500 to $500.

76. In August 2019, DiversyFund extended the waiver of management fees for investments in REIT I made through the end of 2019. Upon information and belief, this reduction of minimums and waiver of fees was a device and mechanism used by Defendants to induce more investors to invest their hard-earned funds into REIT I. And as it turned out, it worked.

77. By the end of 2019, REIT I had raised over $6.4 million from the sale of its Class A shares to hundreds of retail investors. The twin pillars of low investment minimums and no management (platform) fees became part of Defendants' pitch to investors through its website and aggressive social media advertising campaigns that echoed the same representations.

78. DF Manager served as manager of REIT I pursuant to a management agreement dated August 1, 2018 under which it was entitled to collect an asset management fee equal to one-sixth of one percent of the aggregate capital under management of REIT I per month- or approximately 2% per year- of assets under management on shares purchased on or after January 1, 2020. Further, DiversyFund was also entitled to receive an asset management fee of up to 2% of

collected rents from each project in which REIT I invested- another recurring fee that is akin to a recurring management fee.

79. In other words, DiversyFund, per DF Manager, was entitled to collect management fees on investments made on or after January 1, 2020– these recurring asset management fees were only waived as an inducement to investors for investments made **on or before December 31, 2019**. Yet through 2020 and most of 2021, DiversyFund continued to sell REIT I Investor Shares under the premise of "no management fees".

80. In the case of REIT II, the representations on DiversyFund's website and elsewhere in advertising materials concerning "no management fees" were flat out false because DiversyFund collected management fees from REIT II. In its August 26, 2021 Offering Circular Supplement, filed contemporaneously with REIT II's actual commencement of sale of securities to the public, REIT II stated that "the Sponsor [DiversyFund] will charge the Company an annual asset management fee equal to 2% of the capital raised from the sale of Class A Investor Shares." Indeed, as disclosed in the Form 1-K filed on January 10, 2024 for the year ended December 31, 2022, REIT II stated that: "The Sponsor may charge the Company an annual asset management fee equal to 2% of the capital raised from the sale of Class A Investor Shares. For the periods ending December 31, 2022 and

December 31, 2021, the Company paid $212,813 and $166,519 in asset management fees to the Sponsor."

81. Despite the fact that management fees were clearly to be charged to REIT II investors (and REIT I also retained the right to collect management fees on shares sold on or after January 1, 2020), during a substantial portion of 2021 the DiversyFund website represented to investors that DiversyFund required a "minimum investment of only $500 and **no management fees**." (emphasis added).

82. It was only in December 2021, after the SEC called the inaccuracy of its website to DiversyFund's attention, that DiversyFund removed the "no management fees" representations from its website. But this change occurred over three months after the sale of REIT II Investor Shares had commenced. And, the website was also false and misleading with respect to REIT I shares to be purchased on or after January 1, 2020, insofar as DiversyFund remains entitled to collect recurring management fees on capital raised via sale of those shares (even if it has not collected management fees to date).

83. Defendant Lewis, DiversyFund's Chief Investment Officer, later acknowledged in sworn testimony that REIT II's representations that the representation that there would be "no management fee" was not accurate as to REIT II, which did in fact charge a 2% management fee.

84. ~~Investors were misled by these representations, and a~~ A reasonable investor who relied exclusively on DiversyFund's website prior to ~~November~~December 2021 would have mistakenly believed the REIT II charged no management fees and that DiversyFund was not entitled to any management fees with respect to REIT I. The Plaintiffs and the Class members who purchased Class A Investor Shares in REIT II – including but not limited to Plaintiff Hamerling – did in fact suffer an actual, injury in fact by being dispossessed of their investment funds under the auspices of the "no management fee" misrepresentations, and being charged asset management fees from their invested funds when it was represented that no such asset management fees would be charged.

85. Given that Defendants have made ongoing representations as to charging "no management fees" on DiversyFund's website at time as least as late as November 30, 2021, Plaintiffs and the Class would have only been alerted to potential misrepresentation regarding the asset management fees sometime later than November 30, 2021, when the "no management fee" representations were removed from the DiversyFund website and attendant investor update materials. Therefore, it would only be sometime after November 2021 when the Plaintiffs and the Class would have been alerted to the likelihood of violations of law arising out

of these misrepresentations and omissions of fact concerning the management fees charged by DiversyFund to REIT II.

**(b) Acquisition/Developer Fees**

8586. REIT I and REIT II made incomplete partial disclosures concerning the right of DiversyFund to collect acquisition and developer fees when the REITs acquired interests in property and the method by which such fees would be calculated for each project. DiversyFund then collected exorbitant acquisition fees that appear to have exceeded what Defendants had represented DiversyFund would collect from REIT I and REIT II, while at best partially disclosing the quantum of developer and acquisition fees paid, and the method of calculating same in each instance.

**(1) REIT I October 22, 2018 Offering Circular**

8687. The REIT Offering Circular dated October 22, 2018, was in effect from November 13, 2018 through November 21, 2021. As of June 30, 2022, REIT I had raised $65,342,689 under the representations contained in the Offering Circular.

8788. REIT I made the following representations regarding the reporting of fees:

**Report to Investors**

> No less than once per year, the Company will provide investors with a detailed statement showing:
>
> - The fees paid to the Manager and its affiliates; and
> - Any transactions between the Company and the Manager or its affiliates.
>
> In each case, the detailed statement will describe the services performed and the amount of compensation paid.

~~88~~89. The foregoing disclosure and promise of a corresponding promised reporting of a "detailed statement" describing the "services performed and the amount of compensation paid" was material because without it, investors would have no way of knowing the quantum of fees being collected for each project and the method by which same were calculated.

~~89~~90. The REIT I Offering Circular further describes the compensation to the Sponsor (DiversyFund) in connection with the acquisition of a property to be a Developer Fee. REIT I represented in the REIT I Offering Circular that the Developer Fee would be calculated as follows:

> Where the Company owns property directly, or is the sole owner of an entity that owns property, the Sponsor will charge the Company a developer fee of between 6% and 8% of the total project costs, including both "hard" costs (e.g., the cost of land, buildings, construction, and renovation) and "soft" costs (e.g., professional fees).
>
> Where property is owned by an entity in which there is another financial partner – a joint venture – the Sponsor might be entitled to a similar developer fee to the extent negotiated with the financial

partners in such joint venture, which could be higher than the 6% - 8% fee for direct investment. However, the Company's cost of the fee will not exceed 6% - 8% of the Company's share of the total project cost.

~~90~~91. The foregoing general representations concerning developer fees were not superseded by any SEC filings after the filing of the REIT I Offering. Further the REIT I Offering Circular continued in effect through 2022 and was amended by REIT I via sixteen (16) Offering Circular Supplements, the latest of which was filed with the SEC on January 14, 2022. *See, e.g.*, **Exh. 4** (REIT I Offering Circular Supplement No. 16).

**(2) Offering Circular Supplement No. 3**

~~91~~92. On May 21, 2019, REIT I filed Offering Supplement No. 3 disclosing that it had invested $250,000 in DiversyFund Park Blvd, LLC. Regarding the corresponding fees, it made the following disclosure:

**Fees and Compensation of Sponsor in Connection with Investment**

An affiliate of the Company's Manager (the "Sponsor") will be entitled to receive from the Project Entity:

- A developer fee equal to 6-8% of total project costs. Currently, the Sponsor estimates the developer fee will be approximately $1,200,000.

~~92~~93. In connection with DiversyFund Park Blvd, LLC, DiversyFund appears to have collected a development fee of approximately $1,250,000 from

REIT I. *See* REIT I Offering Circular Supplement No. 3 on Form 253G2, filed with the SEC on May 21, 2019. REIT I invested additional sums in DiversyFund Park Blvd, LLC at later dates, was listed as an owner of 52.62% of the equity in DiversyFund Park Blvd, and eventually made a total investment of over $5 million in the project. *See* REIT I Annual Report on Form 1-K for the year ended December 31, 2020, filed with the SEC on April 30, 2021.

~~93~~94. However, no plausible scenario would result in REIT I being responsible for a $1,250,000 development fee based on an initial $250,000 investment, or even the eventual investment of over $5 million, given that the development fee should "not exceed 6% - 8% of the Company's share of the total project cost" as represented.

**(3) 2018 Annual Report**

~~94~~95. In the first Form 1-K annual report filing dated July 26, 2019 for fiscal year 2018, REIT I repeated the same representation as it did in the REIT I Offering Circular quoted at ¶ ~~89~~90, above, regarding the calculation of the Developer and Financing Fee. REIT I also made the same representations regarding the reporting of fees:

> **Report to Investors**
>
> No less than once per year, the Company will provide Investors with a detailed statement showing:

- The fees paid to the Manager and its affiliates; and
- Any transactions between the Company and the Manager or its affiliates.

In each case, the detailed statement will describe the services performed and the amount of compensation paid.

**(4) September 26, 2019 Semi-Annual Report**

9596. In its first Form 1-SA semi-annual report filing dated July 26, 2019 for the period ending June 30, 2019, REIT I made the same representation quoted at ¶ 8990, above, as the Offering Circular regarding the calculation of the Developer and Financing Fee.

9697. REIT I also makes the following disclosures regarding additional investments in certain entities (among others):

. REIT I also makes the following disclosures regarding additional investments in certain entities (among others):

DiversyFund Park Blvd., LLC

On July 9, 2019, the Company made an additional equity investment of $75,000. On July 17, 2019, the Company made an additional equity investment of $50,000. On August 8, 2019, the Company made an additional equity investment of $50,000. On August 13, 2019, the Company made an additional equity investment of $5,000. On August 29, 2019, the Company made an additional equity investment of $8,000. As of September 10, 2019, the Company has made a total equity investment of $688,000.

DF Summerlyn, LLC

> On July 18, 2019, the Company made an equity investment to acquire property regarded as DF Sumerlyn LLC of $50,000. On August 14, 2019, the Company made an additional equity investment of $10,000. On August 26, 2019, the Company made an additional equity investment of $750,000. On August 29, 2019, the Company made an additional equity investment of $22,000. As of September 10, 2019, the Company has made a total equity investment of $1,324,500.

~~97~~98. The foregoing disclosures were rendered false, misleading and/or incomplete by REIT I's failure to provide a "detailed statement" of the "services performed and the amount of compensation paid" by REIT I to DiversyFund and the methodology by which the acquisition fee was calculated. At no subsequent time has REIT I disclosed as such that the development fees collected in connection with the DiversyFund Park Boulevard project exceeded 6% - 8% of the Company's share of the total project cost, nor has REIT I provided a detailed statement showing the fees paid to the Manager and its affiliates the services performed and the amount of compensation paid.

**(5) 2019 Annual Report**

~~98~~99. In the Form 1-K annual report filing dated June 16, 2020 for the 2019 fiscal year, REIT I made the same representation quoted at ¶ ~~89~~90, above, as it did in the Offering Circular regarding the calculation of the Developer and Financing Fee.

99100. REIT I also made the same representations regarding the reporting of fees:

**Report to Investors**

No less than once per year, the Company will provide Investors with a detailed statement showing:

- The fees paid to the Manager and its affiliates; and
- Any transactions between the Company and the Manager or its affiliates. In each case, the detailed statement will describe the services performed and the amount of compensation paid.

100101. REIT I also makes the following disclosures regarding additional investments in certain entities (among others):

DiversyFund Park Blvd., LLC

. REIT I also makes the following disclosures regarding additional investments in certain entities (among others):

DiversyFund Park Blvd., LLC

On January 2, 2020, the Company made an additional equity investment of $90,000. On January 9, 2020, the Company made an additional equity investment of $100,000. On February 10, 2020, the Company made an additional equity investment of $30,000. On February 20, 2020, the Company redeemed capital of $31,000. On February 20, 2020, the Company made an additional equity investment of $35,000. On March 9, 2020, the Company made an additional equity investment of $135,000. On April 15, 2020, the Company made an additional equity investment of $95,000. On May 5, 2020, the Company made an additional equity investment of $30,000. As of June 3, 2020, the Company has made a total equity investment of $1,671,500.

Formatted: Font color: Black

Formatted: Font color: Black

Formatted: Font color: Auto

Formatted: Font color: Auto

> McArthur LG, LLC
>
> On February 5, 2020, the Company made an equity investment to acquire property regarded as McArthur LG LLC of $100,000. On February 19, 2020, the Company made an additional equity investment of $47,500. On March 13, 2020, the Company made an additional equity investment of $125,000. On April 17, 2020, the Company made an additional equity investment of $100,000. On April 21, 2020, the Company made an additional equity investment of $125,600. On April 23, 2020, the Company made an additional equity investment of $50,000. On June 2, 2020, the Company made an additional equity investment of $4,700,000. As of June 3, 2020, the Company has made a total equity investment of $5,255,302.

~~101~~102. REIT I made the following disclosure regarding the fees received by DiversyFund in connection with the acquisition of DF Summerlyn, LLC:

> The Sponsor receives an acquisition fee directly from the Company's real estate investments for sponsoring the acquisition of the asset. The sponsor performs services of sourcing, underwriting, due diligence, investment oversight, arranging debt financing, and execution of the business plan. The Sponsor is entitled to receive up to 5.5% of the total project cost including acquisition price, construction or capital expenditure budget and insurance and carrying costs. In 2019 the Sponsor received acquisition fees totaling $540,088 in connection with the acquisition of DF Summerlyn LLC.

~~102~~103. Given that REIT I invested $1,324,500 into DF Summerlyn, LLC, the $540,088 acquisition fee appears to exceed 5.5% of REIT I's share of the total project cost.

103104. The foregoing disclosures in REIT I's 2019 Annual Report were rendered false, misleading and/or incomplete by REIT I's failure to provide a "detailed statement" of the "services performed and the amount of compensation paid" by REIT I to DiversyFund and the methodology by which the acquisition fee was calculated. At no subsequent time has REIT I disclosed as such that the development fees collected by DiversyFund exceeded 6% - 8% of the Company's share of the total project cost (or 6-8% of the total project cost where the Company owns the property directly, or is the sole owner of an entity that owns property) nor has REIT I provided a detailed statement showing the fees paid to the Manager and its affiliates the services performed and the amount of compensation paid.

**(6) September 28, 2020 Semi-Annual Report**

104105. In the Form 1-SA semi-annual report filing dated September 28, 2020 for the period ending June 30, 2019, REIT I made the same representation as it did in the REIT I Offering Circular quoted at ¶ 8990, above, regarding the calculation of the Developer and Financing Fee.

106. REIT I also makes the following disclosures regarding additional investments in certain entities (among others):

105. REIT I also makes the following disclosures regarding additional investments in certain entities (among others):

~~///~~

DiversyFund Monterey LLC

In the month of July 2020, the Company made additional debt investments in the amount of $145,000. In the month of August 2020, the Company made additional debt investments in the amount of $75,000. In the month of September 2020, the Company made additional debt investments in the amount of $103,252. As of September 17, 2020, the Company has made a total debt investment of $1,740,252.

DiversyFund Park Blvd., LLC

In the month of July 2020, the Company made additional equity investments in the amount of $31,500. In the month of August 2020, the Company made additional equity investments in the amount of $18,700. In the month of September 2020, the Company made additional equity investments in the amount of $37,000. As of September 17, 2020, the Company has made a total equity investment of $1,758,028.

Woodside Highland UT, LLC

In the month of July 2020, the Company made additional equity investments in the amount of $87,475. In the month of August, 2020, the Company made a net equity investment to acquire property regarded as Woodside Highland UT, LLC in the amount of $3,571,791. As of September 17, 2020, the Company has made a total equity investment of $3,664,266.

Blvd West LLC

On July 27, 2020, the Company made a net equity investment to acquire property regarded as Blvd West LLC in the amount of $5,332,290. As of September 17, 2020, the Company has made a total equity investment of $5,874,290.

~~106~~107. REIT I made the following disclosure regarding the fees received by DiversyFund in connection with the acquisition of McArthur LG, LLC:

> The Sponsor receives an acquisition fee directly from the Company's real estate investments for sponsoring the acquisition of the asset. The sponsor performs services of sourcing, underwriting, due diligence, investment oversight, arranging debt financing, and execution of the business plan. The Sponsor is entitled to receive up to 5.5% of the total project cost including acquisition price, construction or capital expenditure budget and insurance and carrying costs. In 2020 the Sponsor received acquisition fees totaling $549,842 in connection with the acquisition of McArthur LG, LLC.

~~107~~108. Given that REIT I invested $5,255,302 into McArthur LG, LLC, the $549,892 acquisition fee appears to exceed 5.5% of REIT I's share of the total project cost.

~~108~~109. The foregoing disclosures were rendered false, misleading and/or incomplete by REIT I's failure to provide a "detailed statement" of the "services performed and the amount of compensation paid" by REIT I to DiversyFund and the methodology by which the acquisition fee was calculated. At no subsequent time has REIT I disclosed as such that the development fees collected by DiversyFund exceeded 6% - 8% of the Company's share of the total project cost (or 6-8% of the total project cost where the Company owns the property directly, or is the sole owner of an entity that owns property) nor has

REIT I provided a detailed statement showing the fees paid to the Manager and its affiliates the services performed and the amount of compensation paid.

**(7) 2020 Annual Report**

~~109~~110**.** In the Form 1-K annual report filing dated April 30, 2021 for the 2020 fiscal year, REIT I made the same representations regarding the reporting of fees:

> **Report to Investors**
>
> No less than once per year, the Company will provide investors with a detailed statement showing:
>
> - The fees paid to the Manager and its affiliates; and
> - Any transactions between the Company and the Manager or its affiliates.
>
> In each case, the detailed statement will describe the services performed and the amount of compensation paid.

~~110~~111. REIT I made the following representations regarding the Developer Fee:

> Developer
>
> Where the Company owns property directly, or is the sole owner of an entity that owns property, the Sponsor will charge the Company a developer fee of between 6% and 8% of the total project costs, including both "hard" costs (e.g., the cost of land, buildings, construction, and renovation) and "soft" costs (e.g., professional fees).

Where property is owned by an entity in which there is another financial partner – a joint venture – the Sponsor might be entitled to a similar developer fee to the extent negotiated with the financial partners in such joint venture, which could be higher than the 6% - 8% fee for direct investment. However, the Company's cost of the fee will not exceed 6% - 8% of the Company's share of the total project cost.
Estimate: The amount of the developer fee will depend on the cost of projects and, in the case of joint ventures, the terms our Sponsor negotiates with joint venture partners. ***For the period ending December 31, 2020, the Company has paid $2,991,636 in developer fees.***

112. REIT I also makes the following disclosures regarding additional investments in certain entities (among others):

DiversyFund Park Blvd., LLC

Formatted: Font color: Black

Formatted: Font color: Black

111. REIT I also makes the following disclosures regarding additional investments in certain entities (among others):

DiversyFund Park Blvd., LLC

Formatted: Font color: Auto

Formatted: Font color: Auto

On January 4, 2021, the Company made an additional equity investment of $20,000. On January 12, 2021, the Company made an additional equity investment of $25,000. In February 2021 the Company invested $80,000. In March 2021 the Company invested $135,000. In April 2021 the Company invested $185,000. As of April 28, 2021, the Company has made a total equity investment of $2,133,668.

201 SW Joan Jefferson Way, LLC

On February 11 2021, the Company acquired Azul Luxury Apartments in Stuart, FL for $7,575,729.

~~112~~113. REIT I also makes the following disclosure regarding certain fees:

*DiversyFund, INC, Sponsor*

The Sponsor receives an acquisition fee directly from the Company's real estate investments for sponsoring the acquisition of the asset. The sponsor performs services of sourcing, underwriting, due diligence, investment oversight, arranging debt financing, and execution of the business plan. The Sponsor is entitled to receive an acquisition fee paid at the asset level of up to 8% of the total project cost including acquisition price, construction or capital expenditure budget and insurance and carrying costs. Sponsor is also entitled to receive a financing fee from the asset level of up to 1% of the total debt amount obtained for a project. Sponsor is also entitled to receive an asset management fee of up to 2% of collected rents from a project. In 2020 the Sponsor received financing and acquisition fees totaling $3,017,136 in connection with the acquisitions of 5 new multi-family properties.

| Property Name | Date | Acquisition Fee | Financing Fee | Total Sponsor Fee |
|---|---|---|---|---|
| McArthur Blvd | 6/2/2020 | $ 549,842 | - | $ 549,842 |
| Boulevard West | 7/27/2020 | $ 927,000 | - | $ 927,000 |
| Woodside | 8/28/2020 | $ 590,313 | - | $ 590,313 |
| Cottonwood | 10/8/2020 | $ 419,200 | $ 25,500 | $ 444,700 |
| France | 12/17/2020 | $ 505,281 | - | $ 505,281 |
| Total | | $ 2,991,636 | $ 25,500 | $ 3,017,136 |

~~113~~114. The foregoing disclosures were rendered false, misleading and/or incomplete by REIT I's failure to provide a "detailed statement" of the "services performed and the amount of compensation paid" by REIT I to DiversyFund and the methodology by which the acquisition fee was calculated. At no subsequent time has REIT I disclosed as such that the development fees collected by DiversyFund exceeded 6% - 8% of the Company's share of the total project cost (or 6-8% of the total project cost where the Company owns the property directly, or is the sole owner of an entity that owns property) nor has REIT I provided a detailed statement showing the fees paid to the Manager and its affiliates the services performed and the amount of compensation paid.

**(8) September 28, 2021 Semi-Annual Report**

~~114~~115. In the Form 1-SA semi-annual report filing dated September 28, 2021 for the period ending June 30, 2021, REIT I makes the following disclosures regarding DiversyFund Park Blvd., LLC:

> In July, 2021, the Company made an additional equity investment of $270,000. In August, 2021, the Company made an additional equity investment of $53,000. In September 2021 the Company invested $105,000. As of September 24, 2021, the Company has made a total equity investment of $3,018,700.

~~115~~116. REIT I also makes the following disclosure regarding certain fees:

> The Sponsor receives an acquisition fee directly from the Company's real estate investments for sponsoring the acquisition of the asset. The sponsor performs services of sourcing, underwriting, due diligence, investment oversight, arranging debt financing, and execution of the business plan. The Sponsor is entitled to receive an acquisition fee paid at the asset level of up to 8.00% of the total project cost including acquisition price, construction or capital expenditure budget and insurance and carrying costs. Sponsor is also entitled to receive a financing fee from the asset level of up to 1% of the total debt amount obtained for a project. Sponsor is also entitled to receive an asset management fee of up to 2% of collected rents from a project. In 2021 the Sponsor received financing and acquisition fees totaling $1,453,720 in connection with the acquisitions of one new multi-family properties.

| Property Name | Date | Acquisition Fee | Financing Fee | Total Sponsor Fee |
|---|---|---|---|---|
| Azul Apartment | 1/27/2021 | $ 1,253,720 | $ 100,000 | $ 1,353,720 |
| Total | | $ 1,253,720 | $ 100,000 | $ 1,353,720 |

~~116~~117. The foregoing disclosures were rendered false, misleading and/or incomplete by REIT I's failure to provide a "detailed statement" of the "services performed and the amount of compensation paid" by REIT I to DiversyFund and the methodology by which the acquisition fee was calculated.

### (9) 2021 Annual Report

~~117~~118. In the Form 1-K annual report filing dated May 3, 2022 for the 2021 fiscal year, REIT I made the same representations regarding the reporting of fees:

> **Report to Investors**
>
> No less than once per year, the Company will provide investors with a detailed statement showing:
>
> - The fees paid to the Manager and its affiliates; and
> - Any transactions between the Company and the Manager or its affiliates.
>
> In each case, the detailed statement will describe the services performed and the amount of compensation paid.

~~118~~119. REIT I made the following representations regarding the Developer Fee:

> Developer
>
> Where the Company owns property directly, or is the sole owner of an entity that owns property, the Sponsor will charge the Company a developer fee of between 6% and 8% of the total project costs, including both "hard" costs (e.g., the cost of land, buildings, construction, and renovation) and "soft" costs (e.g., professional fees).
>
> Where property is owned by an entity in which there is another financial partner – a joint venture – the Sponsor might be entitled to a similar developer fee to the extent negotiated with the financial partners in such joint venture, which could be higher than the 6% - 8% fee for direct investment. However, the Company's cost of the fee will not exceed 6% - 8% of the Company's share of the total project cost.

Estimate: The amount of the developer fee will depend on the cost of projects and, in the case of joint ventures, the terms our Sponsor negotiates with joint venture partners. ***For the period ending December 31, 2021, the Company has paid $ 5,872,627 in developer fees to the Sponsor.***

~~119~~120. REIT I also makes the following disclosures regarding additional investments in certain entities:

DiversyFund Park Blvd., LLC

In January 2022, the Company made an additional equity investment of $90,000. In February 2022 the Company invested $105,000. In March 2022 the Company invested $202,000. In April 2022 the Company invested $40,000. As of April 29, 2022, the Company has made a total equity investment of $3,775,700.

~~///~~

~~120~~121. REIT I also makes the following disclosure regarding certain fees:

The Sponsor receives an acquisition fee directly from the Company's real estate investments for sponsoring the acquisition of the asset. The sponsor performs services of sourcing, underwriting, due diligence, investment oversight, arranging debt financing, and execution of the business plan. The Sponsor is entitled to receive an acquisition fee paid at the asset level of up to 8% of the total project cost including acquisition price, construction or capital expenditure budget and insurance and carrying costs. Sponsor is also entitled to receive a financing fee from the asset level of up to 1% of the total debt amount obtained for a project. Sponsor is also entitled to receive an asset management fee of up to 2% of collected rents from a project. These costs are recorded on the property level financials and are treated as acquisition costs which are amortized over the life of the asset. In 2021 the Sponsor received financing and acquisition fees totaling $6,537,745 in connection with the acquisitions of 4 new multi-family properties and the remaining acquisition and financing fees.

| Property Name | Date | Acquisition Fee | Financing Fee | Total Sponsor Fee |
|---|---|---|---|---|
| Azul | 1/27/2021 | $ 1,253,720 | - | $ 1,253,720 |
| Willow Ridge | 9/01/2021 | $ 1,843,600 | - | $ 1,843,600 |
| Mission Villas | 9/28/2021 | $ 880,000 | - | $ 880,000 |
| NCP Dove | 12/10/2021 | $ 2,560,425 | - | $ 2,560,425 |
| Total | | $ 6,537,745 | $ - | $ 6,537,745 |

~~121~~122. The foregoing disclosures were rendered false, misleading and/or incomplete by REIT I's failure to provide a "detailed statement" of the "services performed and the amount of compensation paid" by REIT I to DiversyFund and the methodology by which the acquisition fee was calculated.

At no subsequent time has REIT I disclosed as such that the development fees collected by DiversyFund exceeded 6% - 8% of the Company's share of the total project cost (or 6-8% of the total project cost where the Company owns the property directly, or is the sole owner of an entity that owns property) nor has REIT I provided a detailed statement showing the fees paid to the Manager and its affiliates the services performed and the amount of compensation paid.

**(10) September 28, 2022 Semi-Annual Report**

122123. In the Form 1-SA semi-annual report filing dated September 28, 2022 for the period ending June 30, 2022, REIT I also makes the following disclosure:

> DiversyFund Park Blvd., LLC
>
> In July 2022, the Company made an additional equity investment of $40,000. In August 2022 the Company invested $445,000. In September 2022 the Company invested $902,887. As of September 26, 2022, the Company has made a total equity investment of $5,311,587.

///

123124. REIT I also makes the following disclosure regarding certain fees:

The Sponsor receives an acquisition fee directly from the Company's real estate investments for sponsoring the acquisition of the asset. The sponsor performs services of sourcing, underwriting, due diligence, investment oversight, arranging debt financing, and execution of the business plan. The Sponsor is entitled to receive an acquisition fee paid at the asset level of up to 8% of the total project cost including acquisition price, construction or capital expenditure budget and insurance and carrying costs. Sponsor is also entitled to receive a financing fee from the asset level of up to 1% of the total debt amount obtained for a project. Sponsor is also entitled to receive an asset management fee of up to 2% of collected rents from a project. These costs are recorded on the property level financials and are treated as acquisition costs which are amortized over the life of the asset. In 2022 ending June 30, the Sponsor received financing and acquisition fees totaling $436,050 in connection with the acquisitions of 1 new multi-family properties and the remaining acquisition and financing fees.

| Property Name | Date | Acquisition Fee | Financing Fee | Total Sponsor Fee |
|---|---|---|---|---|
| Swaying Oaks | 3/11/2022 | $ 436,050 | - | $ 436,050 |
| Total | | $ 436,050 | $ - | $ 436,050 |

~~124~~125. The foregoing disclosures were rendered false, misleading and/or incomplete by REIT I's failure to provide a "detailed statement" of the "services performed and the amount of compensation paid" by REIT I to DiversyFund and the methodology by which the acquisition fee was calculated. At no subsequent time has REIT I disclosed as such that the development fees collected by DiversyFund exceeded 6% - 8% of the Company's share of the total project cost (or 6-8% of the total project cost where the Company owns the property directly, or is the sole owner of an entity that owns property) nor has REIT I provided a detailed statement showing the fees paid to the Manager and its affiliates the services performed and the amount of compensation paid.

**(11) REIT II Offering Circular Supplement No. 1**

~~125~~126. On August 26, 2021, REIT II filed Offering Supplement No. 1 disclosing an increase of the offering size from $50,000,000 to $75,000,000 and revising and superseding the fee structure set forth in the initial REIT II Offering Statement.

~~126~~127. REIT II describes the compensation to the Sponsor (DiversyFund) in connection with the acquisition of a property to be an Acquisition Fee. REIT II represented in Supplement No. 1 that the

> Acquisition Fee would be calculated as follows:
>
> The Sponsor will charge each Project Entity (or the Company itself, if the Company owns real estate directly) an acquisition fee of between 1% and 4% of the total project costs, including both "hard" costs (e.g., the cost of property) and "soft" costs (e.g., professional fees).
>
> Where property is owned by an entity in which there is another financial partner – a joint venture – the Sponsor might be entitled to a similar acquisition fee to the extent negotiated with the financial partners in such joint venture (which could be higher than the 1-4% acquisition fee for direct investment). However, the Company's share of the fee will not exceed 1-4% of the Company's share of the total sale price.
>
> Estimate: If the Company raises the full $75,00,000 and maintains an average leverage ratio (borrowing) of 55%, the sponsor fee would range between $1,666,667 and $6,666,667.

**(12) REIT II 2021 Annual Report**

~~127~~128. In the Amended Form 1-K annual report filing dated May 26, 2022 for the 2021 fiscal year, REIT II made the same representations regarding the reporting of fees:

> **Report to Investors**
>
> No less than once per year, the Company will provide investors with a detailed statement showing:

- The fees paid to the Manager and its affiliates; and
- Any transactions between the Company and the Manager or its affiliates.

In each case, the detailed statement will describe the services performed and the amount of compensation paid.

~~128~~129. REIT II made the following representations regarding the Acquisition Fee:

The Sponsor will charge each Project Entity (or the Company itself, if the Company owns real estate directly) an acquisition fee of between 1% and 4% of the total project costs, including both "hard" costs (e.g., the cost of property) and "soft" costs (e.g., professional fees).

Where property is owned by an entity in which there is another financial partner – a joint venture – the Sponsor might be entitled to a similar acquisition fee to the extent negotiated with the financial partners in such joint venture (which could be higher than the 1-4% acquisition fee for direct investment). However, the Company's share of the fee will not exceed 1-4% of the Company's share of the total sale price.

Estimate: The amount of the acquisition fee will depend on the cost of projects and, in the case of joint ventures, the terms our Sponsor negotiates with joint venture partners. ***For the period ending December 31, 2021, the Company has paid $1,280,2126 in acquisition fees to the Sponsor.***

~~129~~130. It appears that DiversyFund collected an acquisition fee well in excess of 4% of REIT II's share of the acquisition price of NCP Dove, LLC. REIT II disclosed in its annual report dated May 3, 2022 that "[f]or the period ending December 31, 2021, the Company has paid $1,280,2126 [sic] in acquisition fees to the Sponsor." Yet, REIT II appears only to have made one investment as of that

date- the investment of $5,014,216.06 in NCP Dove. This acquisition fee, equal to over 25% of REIT II's principal invested in NCP Dove, LLC, cannot have equaled less than 4% of REIT II's share of the property purchase price.

~~130~~131. REIT II also makes the following disclosures regarding fees, suggesting that REIT II had paid half of the total acquisition fees for NCP Dove, LLC:

> The Sponsor will charge each Project Entity (or the Company itself, if the Company owns real estate directly) an acquisition fee of between 1% and 4% of the total project costs, including both "hard" costs (e.g., the cost of property) and "soft" costs (e.g., professional fees). Where property is owned by an entity in which there is another financial partner – a joint venture – the Sponsor might be entitled to a similar acquisition fee to the extent negotiated with the financial partners in such joint venture (which could be higher than the 1-4% acquisition fee for direct investment). However, the Company's share of the fee will not exceed 1-4% of the Company's share of the total sale price. In 2021 the Sponsor received acquisition fees totaling $2,560,425 in connection with the acquisition of NCP Dove LLC.

~~131~~132. The foregoing disclosures were rendered false, misleading and/or incomplete by REIT II's failure to provide a "detailed statement" of the "services performed and the amount of compensation paid" by REIT II to DiversyFund and the methodology by which the acquisition fee was calculated. At no subsequent time has REIT II disclosed as such that the development fees collected by DiversyFund exceeded 1-4% of the Company's share of the total project cost (or 1-4% of the total project cost where the Company owns the property directly, or is the sole owner of an entity that owns property) nor has REIT II provided a detailed statement showing the fees paid to the Manager and its affiliates the services performed and the amount of compensation paid.

**Formatted:** Font color: Auto

### 3. REIT I and REIT II's Failure to Adhere to Regulation A

~~132~~133. In addition to the foregoing, REIT I and REIT II repeatedly described their offerings of DiversyFund Investor Shares in their SEC filings as being within an exemption from registration under Regulation A, but failed to disclose that REIT ~~II~~I (beginning on or about March 26, 2021) and REIT II (beginning on or about January 31, 2021) had not adhered to the requirements of Regulation A and therefore ~~ran the risk of being disqualified from utilizing the Regulation A~~the REITs' shares were not within a valid exemption from registration. - 134. After March 26, 2021, REIT I referred to its offering of Class A Investor shares as an offering under Regulation A in, without limitation, the following SEC filings: Form 1-K dated April 30, 2021, Form 1-SA dated September 28, 2021 and Form 1-K dated May 3, 2022.

~~133.~~ 135. After January 31, 2021, REIT II referred to its offering of Class A Investor shares as an offering under Regulation A in its Form 1-SA dated September 28, 2021, and did not update the REIT II Offering Circular's description of the offering as exempt from registration under Regulation A before REIT II disclosed the second SEC investigation (Investigation No. LA-5266) in its Form 1-K filed with the SEC on or about May 3, 2022.

136. REIT II had violated Regulation A in several manners that ultimately resulted in the permanent suspension of its offering via the Final SEC Order. *See*

**Exh. 2.** For example, REIT II failed to commence the REIT II Offering until September 2021, even though it was required to commence its continuous offering of REIT II Investor Shares within two days after the qualification of its offering statement on January 21, 2021.

134. *Id.* REIT II also purported to increase its maximum offering amount from $50 million to $75 million through the filing of its August 26, 2021 offering circular supplement instead of through a new offering statement or amendment, in violation of SEC Rule 253(b). *Id.*

Formatted: Font: Italic

135137. REIT I similarly filed a March 26, 2021 Offering Circular Supplement that violated Regulation A, purporting to raise its maximum offering amount from $50 million to $75 million, rather than by filing a new offering statement or post-qualification as was required under the SEC note to Rule 253(b) under Regulation A, which provides that an offering supplement may not be used to increase the volume of securities being offered.

138. These violations, while technical and inadvertent, had the potential to, and later did, result in serious consequences for REIT I and REIT II including the disqualification of the REIT II Offering, as well as causing adverse consequences for both REIT I and REIT II— to be unregistered securities illegally offered and sold without any applicable offering exemption.

139. Although REIT II became aware of the SEC's investigation in November 2021, it did not publicly disclose same in its SEC filings until May 3, 2022 (although it did discuss these issues in court papers filed in February 2022). These violations, including filing Offering Circular Supplements for REITs I and II instead of new offering statements or post-qualifications amendments as was required, caused, REIT II to prematurely terminate its offering, leaving it with insufficient capital, and caused REIT II to incur significant costs and losses totaling over $1 million as of February 10, 2023.

140. The consequences costs, and financial losses caused by REIT I and REIT II's failure to meet the requirements of Regulation A are described by the Defendants themselves in a legal malpractice complaint that Defendants filed against the lawyer and law firms that represented them in connection with the REIT I and REIT II securities offerings under the Regulation A exemption. *See* Complaint in *DF Growth REIT, LLC, et al. v. Flaster Greenberg P.C., et al.*, Docket No. MER-L-000200-23 (Superior Court of New Jersey, Mercer County) ("N.J. Compl.").

141. Defendants alleged that On March 26, 2021, based on advice, analysis, research, investigation and work product prepared by its law firm and attorneys, REIT I filed an "Offering Circular Supplement" to raise its maximum

offering amount from $50 million to $75 million under Regulation A. Based on their law firm Lex Nova and it attorneys' advice, REIT I filed the Offering Circular Supplement rather than a new offering statement or post-qualification amendment. (N.J. Compl. ¶15)

142. Defendants alleged that their attorneys similarly caused REIT II to file on August 26, 2021 an "Offering Circular Supplement" (also seeking to raise its maximum offering amount from $50 million to $75 million) rather than a new offering statement or post-qualification amendment as was required. (N.J. Compl. ¶16)

143. Defendants further alleged that their securities counsel committed legal malpractice because they failed to follow the note to Rule 253(b) under Regulation A provides that "An offering circular supplement may not be used to increase the volume of securities being offered. Additional securities may only be offered pursuant to a new offering statement or post-qualification amendment qualified by the Commission." Because REIT II failed to file an offering statement or post-qualification amendment as required, it failed to obtain review, comment, and qualification by Division of Corporation Finance staff in contravention of the requirement that qualification is a necessary component for Regulation A sales. (N.J. Compl. ¶18.)

144. Defendants alleged that REIT I and REIT II had suffered "disastrous effects" as a result of this "grossly negligent" securities counsel. (N.J. Compl. ¶17.) Defendants alleged that this legal malpractice caused specific, actual, and concrete injury to REIT I and REIT II. Specifically, Defendants alleged that due to the SEC's investigation of the alleged violations, REIT II prematurely terminated its offering, and has incurred significant costs and losses, totaling over $1 million to date. (N.J. Compl. ¶21.)

145. Defendants further alleged that as a result of their attorneys' negligent advice and work product in connection with REIT I and REIT II's respective securities offerings, they have incurred and will continue to incur substantial damages from, among other potential liability, attorneys' fees and costs to defend against the SEC's investigations and proceedings. (N.J. Compl. ¶ 25.)

146. Despite these facts, REIT I held its offering out as a Regulation A offering, and failed to disclose that its offering of securities in excess of $50 million did not quality or otherwise meet the exemption requirements as set forth in Regulation A. As a result, the REIT I securities offered in excess of $50 million were unregistered securities that did not qualify for any valid offering exemption.

147. Defendants Cecilio and Lewis materially aided in the sales of the REIT I securities (including the sales in excess of $50 million) by executing the

REIT I Offering Circulator and represented to investors that "[p]ursuant to the requirements of Regulation A, the issuer certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form 1-A and has duly caused this offering statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of San Diego, State of California, on October 19, 2018."

148. This representation regarding REIT I's satisfying the Regulation A offering requirements quoted in Paragraph 147 above was contained in the REIT I Offering Circular, which, on information and belief, remained available to prospective investors on DiversyFund's website at all relevant times when REIT I shares were being offered.

149. Defendants updated the REIT I Offering Circular via the filing Forms 253G2 with the SEC sixteen (16) times, including on December 3, 2021 and January 14, 2022, after Defendants they would have been aware of the SEC's position concerning the mistakes that caused REIT I's failure to qualify for its claimed Regulation A exemption.

150. The Plaintiffs and the Class suffered an actual, concrete injury as a direct and proximate result of the untrue statement of fact as well as the omissions of material fact in that they parted with their funds and were charged fees thereon

in reliance on DiversyFund Investor Shares being exempt from registration, and no reasonable investor would have purchased unregistered securities not within a valid exemption from registration.

151. Given the illiquid nature of the DiversyFund investments, a favorable decision in this litigation ordering rescission would provide the Plaintiffs and the Class the redress they require by returning their funds to them in exchange for their shares.

Formatted: Indent: First line: 0"

**4. Prior Regulatory Discipline and SEC Investigation**

~~136~~152. Through its aggressive online advertising campaign, DiversyFund ultimately acquired over 29,550 investors in REIT I and REIT II. These investors were largely non-accredited and unsophisticated, and relied on the experience and expertise of management to manage their hard-earned funds. Offering materials for REIT and REIT II, as well as DiversyFund's website, touted Defendant Cecilio's and the management team's experience and success in the real estate business.

~~137~~153. Perhaps nothing is more material to investors in a startup company than disclosures about the background and experience of management – so that investors can accurately gauge management's ability to be successful in the proposed venture. In both the REIT I and REIT II offering circulars, Defendants

completely omitted the Bureau of Real Estate accusations and consent order, which are highly material to Mr. Cecilio and DiversyFund's ability to maintain accurate books and records – a skill that is critical for any high volume real estate investment business. Naturally, if Mr. Cecilio and DiversyFund (which was a DBA of Coastal) cannot maintain accurate books and records for a few hundred investors, it draws into serious question their ability to do so for tens of thousands of investors.

~~138~~154. Accordingly, the California Bureau of Real Estate Accusation and Consent Order involving Cecilio would have altered the total mix of information available to any reasonable investor deciding whether or not to invest into REIT I or REIT II, and should have been disclosed in light of DiversyFund's touting of Cecilio's experience and background as a selling point.

~~139~~155. Similarly, the pendency and closure of an SEC investigation (Investigation No. LA-5069) into DiversyFund is a highly material fact that any reasonable investor would have wanted to know in connection with deciding whether or not to invest in REIT I or REIT II, or conduct business with Defendants generally, as it goes directly to Defendants' ability to run the enterprise within the strict confines of a highly regulated environment. The disclosure of a pending SEC

investigation into DiversyFund would have altered the total mix of information available to any reasonable investor deciding whether or not to invest into REIT I.

~~140~~156. Moreover, given REIT I and REIT II's heavy reliance on access to new investor capital raised under Regulation A to run the day-to-day operations of the DiversyFund, compliance with Regulation A and other SEC regulations was at all relevant times critical to the success or failure of REIT I and REIT II. As such, a pending or recently closed SEC investigation draws into serious question Defendants' ability to comply with applicable laws and regulations – a fact that would be material for any REIT I or REIT II investor to know prior to investing.

~~141~~157. Although Defendants would have preferred not to disclose a pending SEC investigation, once they provided disclosure on a particular issue (such as government investigations), they had a duty to speak on an issue and supplement any previous disclosure to make it accurate and complete.

~~142~~158. In the REIT I offering circular dated October 2018, Defendants provided the following disclosure to investors:

> Neither the Company itself, the Manager, the Sponsor, or any of their respective employees, officers, directors, managers, or members is, to the knowledge of the Company, currently the **subject of any investigation or proceedings by any governmental authorities**.

(REIT I Offering Circular, p. 54). (Emphasis supplied).

~~143~~159. However, REIT I's disclosure later shifted to the following – completely omitting to supplement its previous disclosure (quoted in Paragraph ~~142~~158) regarding the lack of pending investigations or proceedings by any governmental authority:

> As of June 30, 2019, we were not named as a defendant in any active or pending litigation.

(REIT I Semi-Annual Report for period ending June 30, 2019, p. 15)

~~144~~160. After the first SEC investigation was concluded in January 2020, REIT I shifted its disclosure to the following – again without updating its previous statement quoted in Paragraph ~~142~~158 regarding the lack of pending investigations or proceedings by any governmental authority:

> As of June 30, 2020, we were not named as a defendant in any active or pending litigation. However, it is possible that the Company could become involved in various litigation matters arising in the ordinary course of our business. Although we are unable to predict with certainty the eventual outcome of any litigation, management is not aware of any litigation likely to occur that we currently assess as being significant to us.

(REIT I Semi-Annual Report for period ending June 30, 2020, p. 14)

~~145~~161. The first SEC investigation was never disclosed to REIT I investors. Given Defendants' previous disclosure regarding the lack of governmental investigations or proceedings (*see* ¶ ~~142~~158, *supra*), any subsequent

disclosure about legal proceedings was rendered misleading and incomplete by the omission of the fact of the first SEC investigation.

**~~G~~H. Current Status of REITs I and II and DiversyFund**

~~146~~162. Defendants' actions have placed the entire DiversyFund enterprise in peril and call into question the ongoing value of REITs I and II. As discussed above, REIT I and II have no infusion of fresh capital or other revenue to support the operations at the DiversyFund (parent) level, leaving DiversyFund to resort to measures such as borrowing funds from REIT I to support its operations. Both REIT I and REIT II and are also now stuck with illiquid real estate ventures that may need to survive without any infusions of fresh investor capital via DiversyFund until a liquidity event at some future date.

~~147. As of the most recent financial statements, REIT I experienced mounting operating losses in the millions of dollars during 2021 and 2022.~~ REIT II also has reported substantial operating losses and is down to less than $112,000 in cash to fund operations.

163. As a direct and proximate result of the misrepresentations and omissions alleged herein, the Plaintiffs and the Class have been damaged and are entitled to ~~statutory damages in an amount according to proof.~~rescission of the investments in REIT I and REIT II.

## I. Plaintiffs And the Class Have Suffered Injury In Fact

164. Plaintiffs and the Class have suffered injury in fact that is traceable to the misrepresentations and omissions of fact and violations of the Cal. Corp. Code by Defendants that is likely to be addressed by a favorable judicial decision herein. Given the illiquid nature of REIT I and REIT II and the fact that the Plaintiffs and Class members continue to hold these investments, a favorable judicial decision ordering rescission will provide the Plaintiffs and the Class the relief necessary by returning their full amount of their principal (instead of waiting for a principal return net of fees at an unknown later date).

165. In all instances, Plaintiffs and the Class have suffered injury by being dispossessed of the funds that they were induced to invest in DiversyFund Investor Shares, after Defendants made the representations complained of herein, and in the absence of material negative information that rendered Defendants' statements false and misleading. In addition, Plaintiffs and the Class have suffered injury by being charged various fees by the Defendants which they would not have been charged had they not invested.

166. Second, with respect to Defendants' misrepresentations concerning acquisition and developer fees, as well as management fees paid by REIT II,

Plaintiffs and the Class have been damaged by being charged more money in fees than Defendants represented would be charged. Plaintiffs have therefore suffered a monetary harm (i.e. excessive fees) directly traceable to these misrepresentations, that could be redressed by a favorable judgment rendered by this Court.

167. Third, with respect to Defendants' misrepresentations concerning REIT II's lack of a need to raise a certain minimum amount of capital, Plaintiff Hamerling and absent class members have been damaged by the REIT's being unable to raise any additional funds due to the Temporary Suspension Order and the Final SEC Order. REIT II has not sold Class A Investor Shares to the public since early 2022 and REIT II's public offering is effectively terminated, having raised proceeds totaling only $11.3 million. REIT II incurred net losses of $1,829,170 in 2022, the last year for which its audited financial reports are presently available. Therefore, Plaintiff Hamerling and absent class members have been injured in fact by the misrepresentation concerning a lack of a need to raise a certain amount of capital because without in fact raising a critical mass of capital, the REIT II investors' investment funds suffered a diminished value and were forced to bear uneconomical increased costs of operating the REIT per dollar invested.

168. Fourth, with respect to Defendants' representations concerning the exemption of REIT I and REIT II's offerings from registration under Regulation A, Plaintiffs have been harmed by these REITs' inability to raise additional capital due to the fact that their offerings are not within a valid exemption from registration. Plaintiff Hamerling and absent class members who purchased shares of REIT II have also suffered injury because (as alleged in the N.J. Compl. discussed above) REIT II has incurred significant costs and losses totaling over $1 million as of February 10, 2023 as a result of its failure to establish a valid exemption from registration under Regulation A.

169. Fifth, with respect to Defendants misrepresentations and omissions about the prior management discipline and pending SEC investigation, Plaintiffs and the Class have suffered injury by being dispossessed of the funds (and charged fees thereon) that they were induced to invest in DiversyFund Investor Shares, after Defendants made the representations complained of herein, and in the absence of material negative information that rendered Defendants' statements false and misleading.

170. In all instances, a favorable judgment granting Plaintiffs rescission of their purchases of DiversyFund Investor Shares would redress Plaintiffs' injury by refunding them the sums invested, of which the have been deprived as a result of

Defendants' complained-of conduct. In addition, a favorable judgment granting Plaintiffs rescission of their purchases of DiversyFund Investor Shares would redress Plaintiffs' injury by returning the gross amount of sums invested – thereby returning any fees extracted by the Defendants as a direct result of the misrepresentations and omissions herein alleged.

## CLASS ACTION ALLEGATIONS

~~148~~171. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"). The Class in this action ("Class") consists of the individuals:

> All persons who purchased Class A Investor Shares in REIT I and/or REIT II ("DiversyFund Investor Shares") between November 13, 2018 and March 16, 2022 (the "Class Period").

Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with Defendants.

~~149~~172. At least thousands of persons are believed to be members of the putative Class, and those persons or entities are geographically dispersed. Therefore, joinder is impracticable pursuant to FRCP Rule 23(a)(1). Given the illiquid nature of the DiversyFund Investor Shares, the Plaintiffs and the Class still own the DiversyFund Investor Shares, and continuously owned the DiversyFund Investor Shares throughout the Class Period.

~~150~~173. Common issues of fact or law predominate over individual issues within the meaning of FRCP Rule 23(a)(2). Common issues of law and fact include but are not limited to:

(a) whether Defendants made misrepresentations of material facts or omitted to state material facts necessary to make the statements that they made not misleading in violation of Section 25401 of the Cal. Corp. Code;

(b) whether the Defendants' public statements on DiversyFund's website and its Internet advertisements and in REIT I and REIT II's SEC filings were false and misleading, or were rendered misleading by material omissions, in violation of Section 25401 of the Cal. Corp. Code;

(c) whether Defendants DiversyFund, Cecilio and Lewis are jointly and severally liable or otherwise deemed to be control persons of REIT I and/or REIT II within the meaning of Section 25504 of the Cal. Corp. Code;

(d) whether Defendants DiversyFund, Cecilio and Lewis materially aided other Defendants in their violations of Section 25504 of the Cal. Corp. Code; and

(e) the ~~proper measure of statutory damages or the~~ nature and scope of other remedies to which Plaintiffs and the Class are entitled.

~~151~~174. Plaintiffs' interests are typical of, and not antagonistic to the interests of, the Class.

152175. Plaintiffs have retained competent counsel experienced with class actions and complex litigation and intend to vigorously prosecute this action.

153176. A class action is superior to all other methods for the fair and efficient adjudication of this controversy. Indeed, given the relatively small size of Class members' individual claims, a class action is the only method by which Plaintiffs and the Class can efficiently seek redress and obtain a uniform adjudication of their claims.

154177. The size of individual damagesrescission amounts is small in comparison to the scope and scale of the Defendants' alleged violations of law. Plaintiffs do not anticipate any difficulties in the management of this action as a class action.

**COUNT I**

**Violations of Section 25401 of the Cal. Corp. Code**

**(Plaintiffs against Defendants REIT I and REIT II)**

155178. Plaintiffs reallege and incorporate by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

156179. Under § 25401 of the Cal. Corp. Code, it is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue

statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

~~157~~180. As described above, Defendants REIT I and REIT II violated § 25401 of the Cal. Corp. Code by making statements of material fact regarding (i) the interdependency between REIT I and REIT II; (ii) the fees charged by REIT I and REIT II; (iii) the background of management; ~~and~~ (iv) REIT I and REIT II's lack of a need to raise a minimum amount of capital; and (v) the status of REIT I and REIT II Class A Investor shares as exempt from registration, that were untrue, and/or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

~~158. Defendants REIT I and REIT II also discussed the qualifications and experience of management and regulatory investigations in the offering materials for the REITs and elsewhere without disclosing material facts concerning legal proceedings by the California Real Estate Bureau that had resulted in the suspension of Defendant Cecilio's real estate license in 2017 – the year before the commencement of the REIT I Offering, or the fact of an SEC investigation that was pending at relevant times before being closed in or about early 2020.~~

159181. As a result of the sale of REIT I and REIT II securities toalleged herein, the Plaintiffs and the Class by means of written and oralsuffered an actual injury resulting from the foregoing untrue statements of material fact, and omissions of material fact,.

182. Given the illiquid nature of REIT I and REIT II, a favorable judicial decision ordering rescission of the investments into REIT I and REIT II made by the Plaintiffs and Class would redress the issues raised by the Plaintiffs and the Class.

183. Given the illiquid nature of REIT I and REIT II along with the ongoing fees charged by Defendants, a favorable judicial decision ordering rescission can redress the harm the Plaintiffs and the Class have suffered from. As a result of the foregoing, Plaintiffs and the Class seek, and Defendants REIT I and REIT II are each liable to Plaintiffs and the Class for, rescission under § 25501 of the Cal. Corp. Code.

**COUNT II**

**Liability Under Section 25504 of the Cal. Corp. Code**

**(Plaintiff against Defendants DiversyFund, Cecilio and Lewis)**

160184. Plaintiffs reallege and incorporate by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

161. 185. As alleged herein, Defendants DiversyFund, Cecilio, and Lewis each directed the day-to-day management of DF Manager, REIT I and REIT II. As a result, Defendants DiversyFund, Cecilio and Lewis each directly or indirectly controlled persons liable under Section 25401 of the Cal. Corp. Code. Cecilio and Lewis were founders of, business partners in, and owners of DiversyFund, and were each executive officers and/or directors of REIT I and REIT II.

162. 186. Defendants DiversyFund, Cecilio, and Lewis were each instrumental in the offer and sale of the DiversyFund Investor Shares. This material aid included, but was not limited to the development, oversight, approval, and distribution of the advertising and marketing materials used in connection with the offer and sale of the DiversyFund Investor Shares, along with the execution of the various Regulation A offering circulars. Defendants DiversyFund, Cecilio and Lewis each materially aided in the acts and/or transactions constituting the primary violations of Cal. Corp. Code § 25401 alleged herein, and had knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.

163187. As a result of their status as control persons and material aid in the primary violations, Defendants DiversyFund, Cecilio and Lewis are each

jointly and severally liable with one another, to the same extent as each of REIT I and/or REIT II are liable, for ~~the damages and other relief sought herein~~rescission of the investments in REIT I and REIT II purchased by the Plaintiffs and the Class.

**JURY DEMAND**

~~164~~188. Plaintiffs demand a trial by jury on all claims so triable.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request the Court grant Plaintiffs and the Class following relief against the Defendants:

a. Ordering that this action proceed as a class action as to all claims previously alleged;

b. Awarding ~~damages~~rescission of the REIT I and REIT II investments purchased by the Plaintiffs and the Class under the Cal. Corp. Code;

c. Awarding attorneys' fees, costs, and prejudgment interest at the legal rate; and

d. Granting such other and further relief as this Court deems just and proper.

Dated this ~~March 10, 2023~~April 9, 2024

/s/ Todd M. Friedman
Todd M. Friedman (SBN 216752)

LAW OFFICES OF TODD M. FRIEDMAN, P.C.

**Formatted:** Indent: Left: 0", First line: 0", Tab stops: 0", Left + 0.5", Left + 1", Left + 1.5", Left + 2", Left + 2.5", Left + 3", Left + 3.5", Left + 4", Left + 4.5", Left + 5", Left + 5.5", Left + 6", Left + 6.5", Left

**Formatted:** Font: +Body (Times New Roman)

Todd M. Friedman (SBN 216752)
21550 Oxnard St, Suite 780
Woodland Hills, CA 91367
Phone: (877) 206-4741
Fax: (866) 633-0228
tfriedman@toddflaw.com

LAW OFFICES OF JOSHUA B. KONS, LLC
92 Hopmeadow Street, Suite ~~LL1~~
205
Weatogue, CT 06089
Tel: (860) 920-5181
Fax: (860) 920-5174
joshuakons@konslaw.com

LAW OFFICE OF CHRISTOPHER J. GRAY, P.C.
Christopher J. Gray (*pro hac vice*)
~~360 Lexington Ave, 14th Floor~~
60 East 42nd Street, Ste. 4600
New York, New York ~~10017~~10165
Phone: (212) 838-3221
Fax: (212) 937-3139
chris@investorlawyers.net

*Attorneys for Plaintiffs*