BUCHALTER
A Professional Corporation
Sanjay Bhandari (CA 181920)
655 W. Broadway, Suite 1600
San Diego, California 92101
Telephone: 619.219.5335
E-mail: sbhandari@buchalter.com

Attorneys for Defendants DF GROWTH REIT, LLC; DF GROWTH REIT II, LLC; DIVERSYFUND, INC.; CRAIG CECILIO; and ALAN LEWIS

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

MARK FERRY et al.,

Plaintiffs,

v.

DF GROWTH REIT, LLC et al.,

Defendants.

Case No. 3:22-cv-02001-AJB-VET

**DECLARATION OF KEVIN SMITH IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

I, Kevin Smith, hereby declare as follows.

1. I am an attorney licensed to practice in the State of California. I am Chief Legal and Compliance Officer for Defendant DiversyFund, Inc. In that capacity I also regularly work with Defendants DF Growth REIT, LLC and DF Growth REIT II, LLC ("REIT I" and "REIT II"; collectively the "REITs"), as well as Defendants Craig Cecilio and Alan Lewis. I submit this Declaration in support of Defendants' motion to dismiss the Second Amended Complaint ["SAC"; ECF 25]. I have personal knowledge of the business records and other matters discussed herein as a result of having worked on these issues (including the REITs' filings with the U.S. Securities and Exchange Commission ("SEC"), financial statements and results discussed in those filings, the SEC investigation that led to the termination of REIT II's securities offering, and the malpractice complaint Defendants filed against their former securities counsel). If called to testify about the matters discussed herein, I could and

would do so competently.

***Exhibits***

2. The following exhibits are true and correct copies of the documents described below, with notes regarding their relevance and/or admissibility.

| Exhibit | Description | Notes |
|---|---|---|
| 1 | REIT I Offering Circular Supplement No. 3 on Form 253G2, dated May 21, 2019, available on the SEC's website.[1] | *See* SAC ¶ 52, 92-93. |
| 2 | REIT I's Form 1-K/A (annual report – amended) for the year ended December 31, 2021, dated April 28, 2023, available on the SEC's website. | *See* SAC ¶¶ 118-22, 128 (FY2021 report pre-amendment) |
| 3 | REIT II's Form 1-A (Reg. A Offering Stmt., Part II – Offering Circular), dated December 3, 2020, effective January 2021, available on the SEC's website. | *See* SAC ¶¶ 33, 48, 64, 68. |
| 4 | REIT II's Form 1-K/A (annual report – amended) for the year ended December 31, 2021, dated April 28, 2023, available on the SEC's website. | *See* SAC ¶ 130 (referencing prior (non-updated) version of this annual report). |
| 5 | REIT II Offering Circular Supplement No. 1 on Form 253G2, filed August 26, 2021. | *See* SAC ¶ 48, 58, 127. |
| 6 | Malpractice Complaint | *See* SAC ¶¶ 140-145. |
| 7 | Mr. Cecilio's 2017 settlement of real estate broker license issues (public record from government website).[2] | *See* SAC¶¶ 40-45. |

[1] The attached copies correspond to company records, and are publicly available on the SEC's website. It is my understanding that they are judicially noticeable. *Skikstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1016 (9th Cir. 2012).

[2] Exhibit 7 is an official public record published on the California Department of Real Estate's website, available for download here: https://www2.dre.ca.gov/hearingfiles/H04876SD_171002_P.pdf. On information and belief, such official records are subject to judicial notice as public records, especially where (as here) referenced in a complaint. Fed. R. Evid. 201(b); *Interstate Natural Gas Co. v. Southern California Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953) (courts "may take judicial notice of records and reports of administrative

| Exhibit | Description | Notes |
|---|---|---|
| 8 | REIT II Form 1-K for the year ended December 31, 2022, dated January 10, 2024. | *See* SAC ¶¶ 73, 167. |

***Alleged Injuries to the REITs***

3. I have reviewed the SAC's allegations about a legal Malpractice Complaint (attached as Exhibit 6) by DiversyFund against its former securities counsel. I am familiar with that malpractice complaint and the damages claimed in it, having worked with our outside counsel on those matters. Contrary to the SAC (*see* SAC ¶¶ 140-145), none of those damages were suffered by the REITs. Rather, the "costs and losses, totaling over $1 million to date" cited at SAC ¶ 144 were all paid by DiversyFund, not the REITs. For avoidance of doubt: *all injuries/damages* alleged or sought in that lawsuit were suffered by DiversyFund, not the REITs. Indeed, we have initiated the process to dismiss the REITs (and Messrs. Cecilio and Lewis) as plaintiffs in that complaint.

4. In general, though management worried (e.g., in Mr. Lewis' affidavit cited in the SAC) that the SEC's investigation and potential actions against the REITs could be very harmful, the only harms that have manifested were suffered by DiversyFund (and therefore also its principals, Mr. Cecilio and Mr. Lewis). For example, as claimed in the malpractice action, the premature termination of REIT II's securities offering limited its assets to approximately $11 million instead of the $70 million plus that was hoped for, reducing DiversyFund's ability to earn fees by approximately five-sixths. However, the investments received in REIT II were all properly invested, and the assets, in general are expected to continue to perform well, in line with industry benchmarks for similar assets purchased during those years. REIT I, of course, closed its offering of its own accord and invested its funds

bodies."); *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007–08 (9th Cir. 2015) (courts may take judicial notice of documents referenced by complaint).

properly. Its assets are also expected to perform well, in line with industry benchmarks for similar assets purchased during the same period.

5. The SAC also claims that REIT II's 2022 net losses of $1,829,170 were caused by its "languish[ing] without access to additional capital" after its Regulation A exemption was suspended. SAC ¶¶ 73, 167. Plaintiffs provide no evidence for their assertion that net losses stem from reduced assets under management (AUM). In fact, there is no logical relationship between AUM and any increase or decrease in value of AUM. Plaintiffs appear to not understand how value add real estate funds calculate annual income. As set forth on page F-5 of REIT II's audited financials in its publicly available 2022 annual report (*see* Exhibit 8 hereto), the $1,829,170 loss consisted of (1) general and administrative expenses of $19,041, (2) fund management expenses of $359,100 and (3) unrealized investment loss of $1,451,029. An unrealized investment loss is a paper loss on held assets that is driven principally by depreciation expense, a non-cash expense that provides significant tax benefits to the fund and its shareholders by creating a paper loss on assets that have not yet been sold. This does not indicate the asset's actual fair market value. Real property can report an unrealized investment loss, reflecting a significant writeoff for depreciation expenses, while its market value is increasing. This is one of the key benefits of commercial real estate investing. In accordance with Generally Accepted Accounting Principles in the United States, a given asset's actual fair market value may not be reflected on the REIT's financial statements until the asset is sold, when any realized gain or loss would be reflected on that period's financial statements. REIT II invested in multifamily real estate properties and put capital into renovations and improvements to those properties. When renovations and improvements have been completed, REIT II will resell these properties, thereby recouping the cost of these renovations and improvements as well as receiving a positive return on invested capital from increased sale prices. None of these properties has yet been sold and therefore no loss has been—or could have been— realized. Unrealized investment

losses in 2022 were not caused by REIT II's suspension and indeed, the amount of any fund's assets under management are irrelevant to its net income or loss in any year. The fund expects to continue to enjoy the tax benefits of depreciation and unrealized—paper—investment losses even as the real assets appreciate in actual fair market value.

***Allegedly Inadequate and Excessive Acquisition and Developer Fees***

6. I have reviewed Plaintiffs' allegations that the REITs charged excessive acquisition and developer fees and disclosed such fees inadequately.

a. Inadequate disclosure. Plaintiffs do not cite detailed SEC-filed public disclosures made in 2023, true and correct copies of which I attach as Exhibits 2 and 4, which I believe provide a thorough basis for assessing the fees charged in various projects held by the funds.

b. Excessive Acquisition/Developer Fees. I assisted with and recently reviewed numerous business records, including investor disclosures by the REITs concerning acquisition/developer fees.[3] The SAC's allegations reflect a lack of understanding of real estate investment fund fee structures and misinterpret the disclosures on which Plaintiffs rely. For example, in Para. 52 of the SAC Plaintiffs state: "In connection with DiversyFund Park Blvd, LLC, DiversyFund appears to have collected a development fee of approximately $1,250,000 from REIT I. *See* REIT I Offering Circular Supplement No. 3 on Form 253G2, filed with the SEC on May 21, 2019". This statement misreads the disclosure cited, which notes that the Sponsor "…will be entitled to receive from the Project Entity [*i.e.,*

[3] These terms are essentially interchangeable in the real estate industry. Both refer to fees paid to a project sponsor. "Developer fees" is usually used in connection with projects requiring development of raw land, while "acquisition fees" is used for projects that require improvements to existing buildings. Further, while the Project Entity pays costs along the way, fees allocated to the REITs are not actually "paid" but merely allocated as a matter of accounting until project wind-up.

DiversyFund Park Boulevard, LLC] [a] developer fee equal to 6-8% of total project costs". See Ex. 1 at 2. Nowhere does it state that the full developer fee is to be paid by REIT I or by investors in REIT I and nowhere does it state that the amount invested by REIT I in the Project Entity represents the total project cost. I note too that the disclosure cited by Plaintiffs provides an "estimate" of the approximate amount of developer fees to be collected in future—not the amount of developer fees already "collected", as the SAC attempts to claim. Plaintiffs repeat their error in Paras 58-62 when they misconstrue REIT II's disclosure regarding acquisition fees paid by NCP Dove, also known as Avalon II. In Para. 58, Plaintiffs cite REIT II's disclosure of the acquisition fee paid by each Project Entity as "4% of the total project costs, including both "hard" costs (e.g., the cost of property) and "soft" costs (e.g., professional, professional fees), yet later [Para. 61] claim that the developer fee was assessed on the "acquisition price" of NCP Dove, LLC. As disclosed in the offering documents, the acquisition fee is calculated on the total project costs, not the real property acquisition price.

c. Having reviewed corporate records again to confirm for this declaration, including a review of fees collected by the Sponsor from the four projects the SAC alleges were overcharged, I have been unable to find any acquisition or developer fee charges greater than the maximum fee disclosed. In fact, in some cases fees charged were *less than* the maximum fee amount permitted to be charged. In each of the four projects for which Plaintiffs allege they were overcharged (DiversyFund Park Boulevard (*see* SAC ¶¶ 52, 92-94), NCP Dove (*see* SAC ¶¶ 59-62, 127-131), DF Summerlyn (*see* SAC ¶¶ 102-103),

and McArthur LG (*see* SAC ¶¶ 107-108), business records establish that the fees assess by DiversyFund on the REITs were within the range of fees disclosed, as follows:

**i. DiversyFund Park Boulevard (aka Onyx on Park):**

1. *SAC Allegation*: $1,250,000 paid by REIT I on $250,000 invested in 2019, versus disclosed fee range of 6-8% total project cost, see SAC ¶ 52.
2. *Actual Developer Fee on the 2019 $250,000 Investment by REIT I*: $0 which is 0% of total project cost, well below 6-8% range.

**ii. NCP Dove (aka Avalon II):**

1. *SAC Allegation*: $1,280,2126[sic] paid on REIT II's 2021 $5.014M investment, versus disclosed fee cap of 4% of REIT II's share of total sale price, see SAC ¶ 60.
2. *Actual Acquisition Fee on the 2021 $5.014M Investment by REIT II*: $530,106, which was 3.68% of REIT II's 31.07% share in the $46.37M cost for NCP Dove, see Exh. 4, page F-11.

**iii. DF Summerlyn:**

1. *SAC Allegation*: $540,088 paid on REIT I's (unstated) share of total project cost based on REIT I's $1,324,500 investment in 2019, versus fee of 5.5% total project cost disclosed, see SAC ¶ 102.
2. *Actual Acquisition Fee on the 2019 $1.325M investment by REIT I:* $207,015.73, which was 2.18% of REIT I's 38.33% share of the $9,480,772,94 total project cost for DF Summerlyn.

**iv. McArthur LG:**

1. *SAC Allegation*: $549,892 paid in 2020 on REIT I's (unstated) share of total project cost based on REIT I's $5,255,302 invested, versus fee of 5.5% total project cost disclosed, see SAC ¶ 107.
2. *Actual Acquisition Fee on the 2020 $5.255M Investment by REIT I*: $549,842 (5.17% of total project cost).

***Asset Management Fees***

7. Based on business records I have reviewed, Plaintiff Valerie Hamerling (the only plaintiff alleged to have invested in REIT II, *see* SAC ¶ 6) was assessed a total of $32.50 in asset management fees on a total REIT II principal investment of $1,500.

8. Since January 1, 2023, REIT II has not assessed any fund level asset management fees and will not do so through the life of the fund.

9. In my opinion, if fees mattered to an investor, any rational investor would consider all fees. If asset management fees are zero but acquisition fees are 90%, that is not a good deal. An investor could not assess fees without reviewing DiversyFund's publicly filed fee disclosures, all of which listed an asset management fee. *See* Exhibit 3 (REIT II's Form 1-A (Reg. A Offering Stmt., Part II – Offering Circular), dated December 3, 2020, effective January 2021) at 32-34 (listing asset management fee of 2%) and Exhibit 5 (REIT II Offering Circular Supplement No. 1, filed August 26, 2021 before anyone had invested in REIT II) at 1-4 (disclosing asset management fee of 2% and other fees in revised fee structure[4]). REIT I and REIT II investors were informed in fund offering materials that they would receive investment returns, if any, after the respective fund's wind-up. Therefore, they should only care about the overall fee load which is a component of the overall net return on their investment.

[4] The fee structure was redistributed between REIT I and REIT II: while asset management fees were charged for REIT II, other fees charged to REIT I investors were substantially reduced.

Executed under penalty of perjury on June 10, 2024 in Burlingame, California.

Kevin Smith